# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_SVETLANA TRAVIS_

Fill in above the full name of each plaintiff or petitioner.

Case No. 1,2022 CV 10102

-against-

_BANK OF AMERICA, N.A._

Fill in above the full name of each defendant or respondent.

## DECLARATION

_Plaintiff requests additional time to respond to defendants motion to dismiss; as well as permission to file opposition_

Briefly explain above the purpose of the declaration, for example, "in Opposition to Defendant's Motion for Summary Judgment."

I, _Svetlana TRAVIS_, declare under penalty of perjury that the following facts are true and correct:

In the space below, describe any facts that are relevant to the motion or that respond to a court order. You may also refer to and attach any relevant documents.

_Plaintiff did not have enough time to review Defendants motion and to prepare an opposition due to being sick in February, 2023; taking care of her sick kids in February 2023; Preparing a motion to appeal her criminal conviction_

Rev. 6/30/16

in connection to this case due to political corruption. On March 2, 2023 after filing her original 440 motion in Criminal Court in April, 2022, her hearing was scheduled. Plaintiff was granted 20 additional days to submit her notarized a copy of 440 motion and to perfect it.

All this time Plaintiff was busy with writing her 440 motion as Pro Se as well. Please allow Plaintiff time until May, 1 2023. to respond.

Attach additional pages and documents if necessary.

3. 23, 2023

Executed on (date)

Svetlana Travis

Name

442 5th # #1593

Address

Signature

Prison Identification # (if incarcerated)

NY          N          10018

City          State          Zip Code

Telephone Number (if available)

E-mail Address (if available)

*EXHIBIT 1*

*68 pages total*

MAR 2 3 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

            - against -

SVETLANA TRAVIS ZAKHAROVA,
                          Defendant.
-------------------------------------------------------------------X

Indictment No: 4243-2016

Hon: Annie J. Swern, J.S.C.

**NOTICE OF MOTION**

PLEASE TAKE NOTICE, that upon the annexed affirmation of Svetlana Travis Zakharova, the annexed exhibits, and upon all the prior proceedings herein, the undersigned will move in the Supreme Court of New York County at 111 Centre Street, New York, NY 10013 at 10:00 am, on April, 27 2023 or as soon as Movant can be heard, for an order to vacate Defendant's plea pursuant to C.P.L. 440.10 and granting such other ad further relief as this court deems just and proper.

Dated: March 22, 2023

TO: MOTION
    CLERK
    SUPREME COURT
    NEW YORK
    COUNTY.

              John
          John Komondorea
       Assistant District Attorney
   District Attorney's Office: Bronx County
  198 E. 161st Street, Bronx NY 10451
       O: 718-838-7567
       C: 332-227-2038
  KomondoreaJ@BronxDA.NYC.gov

Svetlana Travis,

*Pro Se*

442 Fifth avenue #1993,

New York, NY

10018

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK: CRIMINAL TERM

MAR 2 3 2023

| |
|---|
| PEOPLE OF THE STATE OF NEW YORK |
| Respondent |
| -against- |
| SVETLANA TRAVIS-ZAKHAROVA, |
| Defendant-Movant |

AFFIRMATION IN
SUPPORT OF
MOTION
New York County
Ind. No. 4243/2016
(Annie J. Swern J.S.C.

## Affirmation in Support of Motion 440.10 to Vacate Criminal Judgment

Movant Svetlana Travis affirms under the penalties of perjury:

Movant, Svetlana Travis, Defendant pro se submits and affirms upon information and belief and
under penalty of perjury affirmation of motion to vacate a criminal judgment of the Supreme
Court, New York County, rendered on October 2, 2017, that convicted her on charges of a
Class B Misdemeanor for Attempted Petit Larceny (PEN §155.25) in a plea bargain
exchange for a guilty plea that covers both criminal cases prosecuted by Bronx DA, and a
ninety (90) day sentence that, after almost exactly a year of detention in Rikers Prison, the
judge ruled as time served.

Movant makes this affirmation in support of a motion for an order pursuant to C.P.L.§440.10 (a),
(b), (c), (d), (f), (h), (1h), (j) vacating the judgment against her, due to: 1) The court did not
have jurisdiction of the action or of the person of the defendant; 2) Judgment procured by

3

duress, misrepresentation or fraud; 3) Material evidence adduced by the people at a trial resulting in the judgment was procured in violation of the Movant's rights under the constitution of this state or of the United States; 4) Material evidence adduced at trial resulting in judgment was false and was prior to entry known by prosecutor or court to be false; 5) Improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct if it had appeared in the record, would have required reversal of the judgment upon an appeal there from; 6) Judgment violates the constitution of this state or of the United States, due to both Brady violations and perjured testimony; 7) Newly discovered evidence; 8) Actual immigration consequences.

In People v. Collins, 190 A.D.2d 1054 (3d Dept. 1993), the defendant was convicted of robbery based on the testimony of a single eyewitness. After his conviction, it was discovered that the eyewitness had lied on the stand and that the prosecutor had known about the lie but failed to disclose it to the defense. The defendant filed a 440 motion, and the court granted the motion and vacated his conviction.

I certify that the foregoing statements made by me are true.

Dated: March 23 2023.

Svetlana Travis

GALINA LUTSKER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LU6196898
Qualified in Kings County
My Commission Expires November 24, 2024

4

# Introduction

**Movant's October 2, 2017 sentence for Attempted Petit Larceny is directly related to an incident that eventually led to Movant's prosecution. Movant's plea bargain cover both crime victims: Paul Nippes and Eliot L. Spitzer.**

A. On or about February 13, 2016, former Gov. Eliot Spitzer ("Spitzer") arranged to meet Movant at New York City's Plaza Hotel ("the Plaza") before Movant decided to return to Russia for good on February 14, 2016. Spitzer argued with Movant about her departure, and then Spitzer assaulted her. Movant called 911, and officers from the 18th Police Precinct in New York City responded. EXHIBIT 1

B. After Movant filed a police report, it ended a 5 ½ relationship, bearing many of the characteristics of sexual trafficking, including sexual abuse, physical violence, and alternating promises of financial assistance and frightening coercion EXHIBIT RECORDING.[1] For every generous offer of help from the former Governor, there were also threats to take away Movant's green card and deny her entry to the country; threats to call Movant's school in California and deny her education; threats to the lives of Movant's parents and pet and, ultimately, her person during these years. EXHIBIT 2

---

[1] Note that Movant and Spitzer had known each other since 2010.

C.  Upon information and belief, as well as a preponderance of the evidence, former Gov. Eliot Spitzer and members of his legal network conspired to bury Movant's complaint, by failing to investigate it, and through the use of media smear campaigns, perjured testimony, out-of-jurisdiction legal action, and with lack of the assistance of an attorney, Joseph Murray ("Murray"), who purported to represent Movant, only for it later to be revealed he was working against her interests. EXHIBIT 3[2]

## **FACTS**

## Case No. 1: Movant's Assault

**On February 13, 2016, Movant called 911, falsely stating that she had had a nervous breakdown while being abused by Spitzer in a 15th floor room at The Plaza Hotel.**

A.  Movant lied to 911 to protect herself from Spitzer. He was in the room aggressive and angry, preventing Movant from leaving the room for an hour by throwing her on the floor, hitting her with suitcases, pushing her to the floor, throwing objects at her, choking her numerous times, squeezing her pajamas, and eventually ripping them off, threatening her with murder, a long time admission to a mental home, the murder of her parents and her dog. EXHIBIT 4

---

[2] EXHIBIT 3 contains "vouchers" made by the police from evidence at the assault scene. Hidden phones, ripped clothing, buttons from Movant's pajamas on the floor outside the room.

B. But Spitzer's ongoing death threats against Movant  as well as threats to lock her up in a mental facility were so alarming to her she finally decided she would be safer going to the police, so she filed a police report. EXHIBIT 5 EXHIBIT 6

**Over the next day, video was collected of Movant and Spitzer at the Plaza and at St. Luke's Hospital-Roosevelt. EXHIBIT 6**

**Multiple in-person interviews were then conducted with or about Movant over the next several hours.**

A. Movant was interviewed in person by Dr. Murzakhanova, Sgt. Corrado and Officer Palam.

B. Sgt. Panuccio and Officer Ahearne from the 18th Precinct then interviewed Dr. Murzakhanova in person, and reported that Spitzer and Movant:

> … began arguing about her leaving to go back to Russia. Her boyfriend became angry, picked up her bag containing her property and threw it down. Her boyfriend then picked up her laptop off the counter. Ms. Travis then approached her boyfriend when he grabbed her by the neck. He forced her face down onto the bed or the floor. Her boyfriend then stated, "I'll kill you. I know where your mother lives! I'll kill your dog! I have a lot of connections! I'll ruin your life!"

C. They also reported that "George" called St. Luke's asking for Movant both during and after Movant's stay there.[3] In addition, George visited the hospital and spoke to Dr. Murzakhanova who did not release any information to him.

D. Noting that the story was consistent, Sgt. Corrado wrote:

> She was with the registered owner of the room when an argument ensued about her leaving the country.... She was pushed down on the bed, choked for about three seconds, and then pushed to the floor. [Spitzer] then prevented complainant from leaving room. The complainant states that she had cut herself intentionally on the left arm to escape the hotel room. Sgt. Corrado requested the complainant go over the story several times and confirmed that the story was consistent.

E. Officer Palam wrote:

> The c/v was just getting out from the shower, and heard [Spitzer] enter the room. The c/v wrapped herself in a towel, and [Spitzer] slammed the door to the bathroom. The c/v exits the bathroom [Spitzer] grabs the c/v by both wrists and shoved/throws the c/v onto the bed. The c/v landed on the bed on her back, and pulled the blankets over herself to cover up. The towel fell off the c/v as she was shoved/thrown to the bed. [Spitzer] stood beside the bed

---

[3] Note Spitzer sometimes identifies himself as "George Fox" or "Tom Greggs." His use of the pseudonym George Fox dates back to at least 2008. For example: https://archive.nytimes.com/cityroom.blogs.nytimes.com/2008/03/11/george-fox-spitzer-supporter-and-alias-issues-statement/

placing his fingers on the c/v neck, and applied pressure. The c/v states she couldn't breathe for approximately three seconds. [Spitzer] states "I have people all over the world. I'll kill you, your mother, I'll kill your dog." [Spitzer] takes the computer into the bathroom. The c/v puts on her pajamas and walks into the bathroom. [Spitzer] again grabs the c/v by the wrists pushing her down to the carpet. The c/v states she is scared/crying/shaking at this point. [Spitzer] states, "Clean the room, bitch!" "I put you to jail" "You'll die in mental home!" "I have people all over the world!" "I'm going to kill your mother."

**Meanwhile, Officer Zapata interviewed Spitzer at the Plaza:**

She had a breakdown … she cut herself … she is on her period." He then further states, "Do you know who I am? Do I have to call Bill… you know Bratton?" (Ex 89, p.12)

A. Spitzer stated through his lawyer[4] that he was there to help Movant with her period, then that he was helping with nervous breakdown. But when Movant escaped the room to and stood in the Plaza hotel lobby, bare foot, wearing ripped pajamas and bleeding, officers came to 15th floor, and Spitzer at first did not want to open the door. EXHIBIT 7[5]

---

[4] Spitzer needed a lawyer 3 days after allegations of assault. Note that Kaufmann complained to Bronx only in July, 2016. What were they waiting for? Signed NDA

[5] On p.12 of this EXHIBIT: A male who is immediately recognized as Spitzer cracks the door open, sticks his face out and states "There is no emergency here. Everything is fine" while Movant was standing at The Plaza Hotel lobby, shoeless, shaking, in ripped pajama, crying and bleeding.

B. He then shut the door in front of the officers, stating that everything was fine and during a second knock on the door, he stated that the blood in the room was from Movant's period, without mentioning Movant's need of help, as he later claimed.

It is also hard to understand why all this time that Movant was standing at the Plaza's lobby for at least 10 minutes, Spitzer did not call anyone to seek Movant or to notify anyone that she needed help, nor stated the same to EMS or Police. EXHIBIT 8[7]

Movant's domestic violence and assault complaint report was prosecuted by BRAM unit immediately without any signs of robbery or complaints of robbery from Spitzer. Despite seeing a video from Plaza Hotel lobby and elevators, where Movant stood wearing ripped off pajama, bleeding, shoeless, visibly stressed, crying, shaking, not talking to anybody about the assault nor receiving any help from the stuff; blood on the walls at the Plaza Hotel, room that was "in dissarray, Spitzer's threats of power with his name or his friend's name Bill Branton, former NYC Police Commissioner at the time of assault.

It did not bother authorities that Spitzer at first "stuck his face out and stated: There is no emergency here! Everything is fine here!" Immediately closed door and that later he threatened with names of highest NYPD person, who supposedly could be in charge of Police Officers carriers.

---

[7] On p. 6 of EXHIBIT 8 we see that People knew Movant was standing barefoot, crying, shaking, in ripped pajamas, bleeding at The Plaza Hotel lobby, trying to get in to the elevators unsuccessfully while Spitzer was in the room stating everything is fine and that he came to help.

**Yet on January 10, 2017, in his Answering Affirmation, ADA Boyle claimed that Movant's story was inconsistent,** EXHIBIT **9, p. 4, namely, that:**

A. She made different allegations to an attending nurse at St. Luke's than she did to Dr. Murzakhanova;

B. In her written statement to the interviewing detectives, Movant again provided new details about the events that occurred at the Plaza. Specifically, she alleged that Spitzer had choked her and threatened to kill her, among other threats;

C. During the course of her interview with the detectives at the Mid-Town North Precinct, Defendant expressed a sudden desire to leave, and "she opened a rear car door of the vehicle transporting her, exited the vehicle and left the area," and officers were unable to find her.[10]

## <u>Spitzer Threats and the Lawyer He Hires "for Movant"</u>

**After the Plaza incident, the Police took Movant's belongings to "Safekeeping", and Movant's luggage was inaccessible because it was at the Plaza, along with Movant's documents and electronic devices.**

A. Detective Palam conspiring with Hon. Judge Ward and Spitzer blocked Movant from accessing her own belongings and her request for money to buy a sweater and the flight

_____

[10] Considering that in 1,5 hours officers took Movant's phone at JFK airport.

upgrade she would have paid for herself had she had access to her own money and belongings. This was treated as an extortion.[12]

B.  Thus, Spitzer took Movant to Saks Department Store to buy a sweater because it was cold and Movant had only had a T-shirt with her in the middle of February, while sitting at the police station for the twelve (12) hours it took the NYPD to write up the complaint on a day abc7 New York described in a headline as "Valentine's Day of 2016 was the coldest in New York City's history."[13]

C.  After Spitzer took her to the airport, where her phone was confiscated, she was already being referred to as the "perp". EXHIBIT 10

**Once Movant returned to Russia, Spitzer called her and threatened her again, saying if he heard from her again, her parents would die. EXHIBIT 11**

A.  Spitzer also ordered her to write an email to him, stating that the police report was fake, to indicate that she had a history of mention health problems and had stayed in mental hospitals all over the world to exonerate him. Movant was scared of him and complied. EXHIBIT 11

B.  Movant complied because she was scared of his threats to kill her and her parents. EXHIBIT 47

---

[12] Larceny by means of extortion Penal Law 155.40.

[13] The coldest Valentine's Day in New York City's history: https://abc7ny.com/record-low-temperature-cold-central-park/1201463/

C. The email was later sent to the Police, the NY Times and the NY Post to print an article exonerating Spitzer by his lawyer Adam Kaufmann. EXHIBIT 12

D. Movant had recorded the threats Spitzer had made against her and her family after the abuse at The Plaza Hotel, and she sent him copies, asking him to not threaten her family again or the threats would be sent to both police and to journalists. This action was later deemed an extortion *Penal Law 155.40*, such as Movant was extorting Spitzer by trying to spread embarrassing details about him, considering that Movant didn't ask for money and embarrassing details were Spitzer's criminal acts.

E. Spitzer then called and apologized. He insisted that he will buy a new apartment for Movant. Movant refused to accept the money. Spitzer then said that he would buy an apartment for her parents. Since Spitzer had threatened to kill Movant's parents, and he knew where her parents then lived, Movant decided to accept the money, hoping that her parents would be safer if she were able to use the money to get her parents a new apartment in an undisclosed location.

**On March 31, 2016, Spitzer hired Atty. Adam Miller to help Movant retrieve her belongings from "Safekeeping," noting that it would be hard to get Movant's belongings from Police "Safekeeping" quickly without help.** EXHIBIT 13[15]

---

[15] EXHIBIT 13 shows that Spitzer paid Atty. Miller not long before he decided to step off the case without notifying Movant.

A. Atty. Miller did not notify Movant that he had ceased working for her right before her arrest, on September 13, 2016 and that her belongings, which included her passport and green card were destroyed by NYPD, while the criminal case was pending during Movant's detention at Rikers Island Correction Facility. EXHIBIT 14

B. While working for Movant, Atty. Miller hired a private investigator, Herman Weisberg ("Weisburg"), a former police officer and current owner of the security firm Sage Intelligence, without Movant's approval and without explaining why his help was needed to retrieve Movant's belongings.

C. Both Miller and Weisberg were paid by Spitzer. EXHIBIT 15 All these men — Spitzer, Miller, Weisberg — were previously known to each other, and they all worked at the same office under R. H. Morgenthau, Manhattan's former District Attorney.

D. Three days after Movant agreed to accept help from Atty. Miller, Herman Weisberg commented in a newspaper article published on April, 4 2016 and intended to smear Movant. In the article, "Why Hookers only want high profile men" Weisburg comments that after looking at the details of Spitzer's case, he sees it as an extortion case while Spitzer deposited checks that contain forged[16] Movant's signature onto Movant's bank account . EXHIBIT 16[17]

## Case No. 2: Spitzer's Extortion

_____

[16]

[17] New York Post article alleging extortion.

**By 4:35 PM on February 14, 2016, a "subpoena [was] provided by DA Clarke," long before Bronx DA was assigned to the case as "Special Prosecutors" on February 17, 2016. EXHIBIT 17 p. 19 and EXHIBIT 18 p. 3 The unit reporting was BRAM (Burglary Robbery Apprehension Module Manhattan North), not the Domestic Violence Unit. EXHIBIT 19**

A. On Wednesday February 17, 2016, the case was transferred to the Bronx and special prosecutors were appointed to the case to prevent a conflict of interest, stemming from former District Attorney Cyrus Vance's friendship with Spitzer.[18]

B. At 5PM on February 14 2016, Movant was met at JFK by four officers with a search warrant. Her phone was confiscated, and she was already being referred to as the "perp." EXHIBIT 20., p. 17

C. Then she left the country, and Spitzer's case — not Movant's — continued without her.

**On or about February 14, 2016, Michael Palam obtained search warrants, falsely stating, under penalty of perjury, that he was informed by Svetlana Travis that "Spitzer picked up a computer owned by Svetlana Travis and said 'I'm going to destroy everything on this computer.'" EXHIBIT 21 It is noted that only Palam stated this information in Unapproved Police Statements. EXHIBIT 22. It was Palam, whose statements were inconsistent, not Movant, despite ADA Boyle's allegations.**

---

[18] A fundamental right provided by the Fourteenth Amendment is the guarantee of due process whenever the federal or state government's power is used to deprive an individual of life, liberty, or property. Due process requires the use of fair procedures before any deprivation can occur. The fair procedures required depend upon the type of deprivation that occurs."

A. Movant never said that to Palam, he lied in order to conspire with Spitzer. Palam lied in order to obtain a search warrant to search the computer and to find "evidence" of Movant's possible misconduct. "Courts cannot reasonably rely on warrants that are based upon affidavits containing false statements made knowingly or intentionally or with reckless disregard for the truth"); People v. Rock, 33 A.D. 3d 334, 334 (1st Dept. 2006)

B. The search warrant was signed during court off hours — on February 14, 2016, which was a Sunday — and should have been signed by a Supervisor Judge, who was then Hon. Anthony Cannataro in 2016. The warrant was instead signed by Judge Laura Ward, known to Spitzer since at least 1992, instead.[19]

Palam's search warrant at the Plaza Hotel restricted Movant's access to her bank cards, and Spitzer had already taken Movant's money from the hotel which he ripped off previously. EXHIBIT 23 This presented Palam with the opportunity to use Movant's request that Eliot Spitzer provide her with money for a sweater and a flight upgrade due to her pregnancy for a 10-hour flight to Russia as further evidence that she was extorting Spitzer. Yet Movant was only asking for what she would have purchased for herself if Palam and Spitzer had not blocked her from her own money.

---

[19] https://www.nytimes.com/1992/05/03/nyregion/bare-fisted-violence-or-subtle-threats.html

The same Judge refused to proceed with trial at Brooklyn Civil Court on January 17, 2023 stating she previously worked for the company Movant was suing – 1511-1521 Brightwater LLC and thus cannot proceed due to conflict of interest. But, upon information and belief, Hon. Ward  had never worked for that company.

C.  On information and belief, the search warrant was obtained for the purpose of seizing Movant's computer and phones. By inference, it would appear the goal was to ensure Movant did not arrive in Russia with any access to evidence of Spitzer's misconduct. This provided time for prosecutors conspiring with Spitzer to search for a means to accuse Movant of larceny or extortion. Evidence from the investigation does not include cash that Spitzer tore apart and Movant's pajamas, which Spitzer had also ripped, pajama buttons laying at the main corridor outside the room where "extortion" happened where the phone wires which Spitzer took off while at the Hotel to block Movant's access to possible help and a videos obtained at The Plaza Hotel, which showed how Movant was standing at Plaza's lobby barefoot in ripped off pajama for 15 minutes, bleeding, shaking, trying to enter the elevator unsuccessfully, due to not having a room card to get in to the elevator and video from the elevator. This is because that evidence would help substantiate Movant's police report alleging Mr. Spitzer's assault at the Plaza Hotel.

D.  In other investigative actions, on February 15, 2016, an International Travel "Look Out" Form was filed against Movant, and on February 16, 2016, a request for DNA evidence was made. On March 15, 2016 Investigators, without interviewing Spitzer or other witnesses wrote that Spitzer, refered as "perp" called hospital Mount Sinai[20] EXHIBIT 24, p6   However, a formal subpoena to Spitzers phone number was issued on March 15, 2016. EXHIBIT 25. Almost 1 month Spitzer was identified as perpetrator, but no one yet even questioned him.

---

[20] It's unclear how Spitzer discovered which hospital Movant had been taken to.

**In March 2016, ADA Boyle subpoenaed Bank of America, requesting Movant's 2015 bank account information, and they provided him with "evidence" in the form of checks that Spitzer deposited into Movant's bank account during the time Movant was in Russia and entire bank record.**

A. The deposits to Movant's account were made using Movant's bank card, which was supposed to be in "Safekeeping" with the Police, but the password was obtained from Movant's computer, which contained a document with a list of all her saved passwords.

B. These checks were deposited into Movant's bank account despite the fact she was not in the country between February 14, 2016 and July 2016, as noted by ADA Komondorea — and could not physically sign them.

C. Long before Bronx was assigned as Special Prosecutors, they acted in a way to harm Movant by failing to investigate abuse by Spitzer.

D. Spitzer's process was to write and deposit the checks into Movant's bank account on the same day they were written. For example, a $30,000.00 check was written by Spitzer on or about February 22, 2016 and deposited to Movant's bank account on the same day by Spitzer. EXHIBIT 26

| Wire Transfers U.S. to Russia | |
| --- | --- |
| DATE | SUM |
| February 29, 2016 | 14,000.00 |
| April 1, 2016 | 30,000.00 |
| April 14, 2016 | 5,000.00 |
| May 06, 2016 | 30,000.00 |
| | Total: $79,000.00 |

| Deposits of Forged Checks in USA | |
| --- | --- |
| DATE | SUM |
| February 22, 2016 | 30,000.00 |
| March 25, 2016 | 25,000.00 |
| April 13, 2016 | 5,000.00 |
| April 21, 2016 | 5,000.00 |
| April 28, 2016 | 50,000.00 |
| June 1, 2016 | 50,000.00 |
| June 17, 2016 | 15,000.00 |
| | $180,000.00 |

In "The Reports that Drew Federal Eyes to Spitzer," published March 12, 2008 in the New York Times, reporters David Johnston and Steve Labaton wrote:

> Last summer, employees at a large New York bank detected . . . Gov. Eliot Spitzer was moving around thousands of dollars in what **they thought was an effort to conceal the fact that the money was his own. . . . [T]he apparent sleight of hand kept the transactions small and removed his name from deposits.**

The governor's actions prompted the bank to file alerts known as Suspicious Activity Reports with the Treasury Department, which were reviewed by I.R.S. agents on Long Island, the federal officials said. A few months later, another New York bank sent its own reports of suspicious activity to the Treasury. They showed that Mr. Spitzer and others, including people overseas, collectively deposited hundreds of thousands of dollars into an account of a company called QAT International Inc., whose business involved foreign accounts and shell companies and appeared to be vaguely related to pornography Web sites.[21]

That is how Spitzer got caught on a federal wiretap with an escort agency, which ultimately led to his resignation as governor[22] [23]

On February 1, 2016, Spitzer wired $20.000.00 to Movant *without* forging Movant's signature on his bank account. EXHIBIT 27

---

[21] https://www.nytimes.com/2008/03/12/nyregion/12legal.html

[22] "Just getting a deposit from him was an issue, he would send money orders to book an appointment". He [Spitzer] was like "I can't go to a bank." From *Client 9: The Rise and Fall of Eliot Spitzer,* dir. Alex Gibney, Magnolia Pictures (2010).

[23] [23] Ashlee Dupree and other women were hired by escort agency "Emperor Club VIP". The agency offered services of escort and dating. They did not offer services of women exchanging sex with customers for money. One employee recalls: "In the second meeting I was rather pushy with him, I was like Are we gonna sit and have a chit chat? And have a nice little day here?" Movie Client 9: The Rise and Fall of Eliot Spitzer. "He started to request me, I saw him outside of New York, in Palm Beach, Puerto Rico, Dallas, Washington…"

But there are many reasons it would have served Spitzer's purpose to forge *subsequent* checks in Movant's name, rather than to send her additional transfers.

   A.  Forgery ensured that the Bank Secrecy Act, and requisite reporting of Spitzer's transactions, was *not* triggered.

   B.  Forgery made it simpler — and safer — to send $50,000.00 to Movant, which was the minimum necessary amount to build a successful extortion case against her, and ultimately charge her with a B Felony. EXHIBIT 28

   C.  Forgery also avoided scrutiny from bank workers. Bank workers ask why senders are transferring money and to whom with each and every transaction. If Spitzer had claimed the money was being extorted, his bank would not have allowed the wire, which in turn would have prevented him from building and prosecuting a false extortion case against Movant.

Upon receiving the Subpoena results from Bank of America, prosecutors saw that the wires were sent to the bank account of a third party, not Movant. EXHIBIT 29. Yet they charged Movant with Larceny.

The Prosecutors also redacted the checks on February 13, 2017 before they gave evidence to Atty. Murray.[26]

Knowingly and intentionally, they also conspired to hide Spitzer's forged checks that Spitzer had sent internationally. EXHIBIT 30. (Until recently, Movant was not aware Spitzer's had

---

[26] By clicking on the document and seeing when it was edited you can see the modification date.

forged any checks because Bank of America did not provide Movant with her bank statements after she was released from jail).

This evidence was forged, a fact that was known to prosecutors, and thus cannot be used as evidence against Movant. NY Crim. Proc. Law 440.10(c) States that material evidence known to the prosecutors to be false cannot be used.

## Boyle's False Claims about Movant and the Media

**ADA Boyle and the reporters who visited Movant in jail should be deposed and questioned once again about Movant's interactions with the media under penalty of perjury.**

A. On or about February 15, 2017, ADA Thomas Boyle lied under penalty of perjury in his application to obtain a gag order that denied the Movant the right speak to the press about the case, stating that Movant had agreed to give interviews to at least one media outlet in "exchange for a large amount of money."

B. But Movant never made any such agreement, and Movant was never offered any money by the journalists/media, and never offered money to anyone herself.

C. Movant had also never agreed to any interview with the media and never revealed any details of the case to any media outlet, with one exception. (See The Trial Lawyer below.)

## Spitzer's Interference with Movant's Immigration Case

**On February 2020, Spitzer's name was found on Movant's immigration removal case folder, even though he was never mentioned in her removal case. EXHIBIT 31. As of**

**July 31, 2019, Movant's removal proceedings are subject to a bar from entrance, which can be either five years, ten years, or for a lifetime. Movant's Misdemeanor B in this criminal proceedings involves Crime Involving Moral Turpritude (CIMT) and upon decision on removal involves a lifetime bar.[27]**

A. There is no coincidence that the date of crime marked February 13, 2016 was not the date of the crime Movant pled to, which was June 2014. An Immigration Ban counts only after admission of an alien to the country. Movant was admitted (got her green card) on December 24, 2014. EXHIBIT 32

B. What Movant pled to happened prior to her admission — in June 2014. EXHIBIT 33 EXHIBIT 34, EXHIBIT 35 This was done on purpose to later, after Movant was detained in jail, accepting a plea with $1 million bail and bond, remove Movant from the US, because CIMT count on the removal only after admission.

C. By law date of the crime had to be brought on June 2014, not Spitzer-related charges on February, 2016.

---

[27] A person who is subject to the grounds of deportability is deportable for one or more CIMT convictions that occur after admission i.e. getting green card, as long as they do not arise from a single scheme of criminal misconduct. INA § 237(a)(2)(A)(ii), 8 USC § 1227(a)(2)(A)(ii). A conviction always is required for the CIMT deportation grounds; admitting the conduct will not cause deportability. Being convicted of an offense that is not a CIMT does not affect this analysis; only CIMTs are counted.

D. But even Spitzer-related charges of B Felony larcenies appear to have discrepancies in dates. EXHIBIT 36[28] Another date of crime is listed as February 14 or 15 EXHIBIT 37 while the date of crime on WebCriminal website is listed as February 13, 2016 EXHIBIT 38. The dates of Spitzer's extortion are listed from March 2010 until October 2016 EXHIBIT 39. So the year of his victimization is unclear — 2013 or 2014? EXHIBIT 40.

**Supreme Court Civil Lawsuit where Spitzer was seeking $1.00 in damages for $400,000 grand larceny extortion that Spitzer filed against Movant, claiming she had extorted him between 2014 to 2016 by threatening to expose their relationship to his family.** EXHIBIT 41

A. Spitzer stated to Movant that this case would be referred to the police for the prosecution of Movant, and Movant arrived in New York from Russia despite numerous travel alerts in order to sign his Settlement and Confidentiality Agreement.[29] EXHIBIT 42

B. In February 2023 Movant requested the case be reopened due to many errors in filing discontinuance, EXHIBIT 43 but Spitzer opposed Movant's request, calling it harassment. EXHIBIT 44. The case was then transferred to current Judge Hon. P. Goetz and, upon information and belief, it is now sealed.[30]

---

[28] Spitzer related charges shown as March 2014 – October 2016. Yet in October 2016, Movant's mother did not receive any forged check(s) from Spitzer.

[29] In the early days of their acquaintance, Spitzer told Movant his name was "Tom Greggs."

[30] Unsealed case against Movant's alleged extortion was fine online and to public access but when Movant decided to proceed with the allegations in Spitzer's complaint he immediately opposed and sealed the case.

## Movant's Relationship with Spitzer

**Spitzer was approximately 50+ years old when he and Movant, then 20, first met via their mutual friend, Spitzer's lover from Washington, DC.**

He was the State's former Governor, former Attorney General, and the New York City's former District Attorney whose political career ended in a scandal involving a federal wiretap and a prostitution ring. In private life, he was also the successful president of Spitzer Engineering Co.

Movant was 20-years-old Russian national with no criminal record, who finished a dual degree in journalism and literature at the University of Moscow while living in the United States, in addition to completing a film certificate in New York Film Academy, New York Photo School,, and matriculating for a semester in Chapman University in December, 20 2015.

On February 13, 2016, Spitzer raped and infected her with Chlamydia at the Plaza Hotel, Spitzer as well raped Movant at his apartment at 800 Fifth avenue after Police Precinct or even earlier at The Lowell Hotel bruary,1 2016.[34]

When Movant was in Russia Spitzer called Movant and threatened to kill Movant's mother, Movant and Movant's dog.

During abuse Movant was 13 weeks pregnant, and in Russia she has a miscarriage.

---

After miscarriage Movant confronted him of the STDs she was infected with and Spitzer told
Movant it was her own infection. In order to obtain medical results of Spitzer's sexual health,
Movant agreed see him in Paris, otherwise Spitzer would not provide any results.

him sex. Movant did not plan to stay with Spitzer in Paris and rented her own place.

Spitzer then sent Movant lab results and hid a bigger part of it.

Spitzer's authentic lab results show that he hid Chlamydia that he infected Movant with.

During the years Spitzer promised many things such as paying for education or rent in exchange
for silence of his misconduct. When Movant wanted to leave the relationships, Spitzer
threatened her with death threats, killing her family, her dog, take away her green card and
other threats.

When Movant asked Spitzer to pay for what he promised, he told Movant that she is greedy. For
example, in 2014 Spitzer promised to pay for Movant's apartment and her budget was $2500.
Movant found an apartment on Upper East Side as Spitzer insisted. First apartment was
rented with Nippes help and later Movant's belongings were thrown out by Nippes. In midst
of her educational semester Movant had no place to live, but still finished her course at
NYFA. Then Movant lived with a friend in New Jersey and only in June Movant found an
apartment on 88 Street in New York. Spitzer said he would pay for the rent, but he did not. In
November 2014 Movant had a debt – it wasn't paid for 2,5 months and Spitzer said that
Movant is greedy and needs to work out the money with him by providing more sex.

Movant asked to borrow money from her friend writer, Steve Freedman, but he did not have this
money and offered her to publish an article from the book that they co written together since

2012. The article name was Sex is Sex but Money is Money. Movant was paid $7.000.00 and this is how she paid for her apartment.

Spitzer's lover then offered Movant to live with her and Spitzer came to her address to rape Movant there.

After Kristin found out that Movant did not invite her from Washington to participate in time being with Spitzer, she told Movant that she needs to move out. Movant's explanation that she did not wish to wait for Kristin and spend 3 hours alone with Spitzer was not accepted. Movant then did not have a place to live and lived with a friend, when Spitzer promised her yet again an apartment, this time in his building. He promised an immediate approval. From February to March Spitzer engaged in unwanted sex with Movant, with threats to kill her if she leaves him. When movant said she doesn't have a place to live, because she lived with a friend after Kristin Spitzer said he will help her with an apartment and then he called management and asked the lease to be cancelled.

As unfulfilled financial promises by Spitzer were not only to Movant, but to his lover Kristin as well. He promised to pay for her degree, yet he paid only for 1 semester and the other one Kristin covered from her retirement savings. The furniture at her New York apartment he also promised to cover, yet he did not and she paid form her retirement savings. Meanwhile engaging in sex that his lover clearly couldn't take.

As for Movant, Spitzer promised things, made Movant go debt before Plaza abuse became public, he always put block on the checks, knowingly that Movant has an eviction proceedings at three (3) different apartments in 2013, 2014, and 2015 and asked that the money must be paid off before he sends anything. When Movant tried to live on her own

and make her own money while awaiting her work authorization documents as well as social

security number, Spitzer blocked opportunities as well and coerced when Movant wanted to

leave him by threats of murder and many other threats.

Spitzer often smoked marijuana, sniffed cocaine, used ecstasy and drank alcohol. He also

repeatedly demanded that Movant engage in dangerous sexual activities by raping Movant

without a condom, infecting Movant with various sexually transmitted infections (STIs), and

forcing Movant to insert sexual devices into his anal cavity, among many other sexual things

Movant did not want to participate in.

To exonerate Spitzer in his misconduct, he ordered Movant write him emails where Movant

states that the police report was all fake. After Spitzer was sure that Movant deposited money

for the apartment that was about to be built, and was in debt, establishing a "payment plan"

with the landlord, he sent funds in exchange for agreeing to see him in Paris or sending him

voicemails confirming blackmailing him and extortion, meanwhile Movant was not even

aware of the translation of these two words. Movant was in shock when she was started to

haunt by the debt collectors and was afraid to lose her apartment.

## Confidentiality, Arrest and Detention

**On July 17, 2016, Movant returned from Russia to sign a Settlement and Confidentiality**

**Agreement with Spitzer because he told her that his lawsuit would otherwise be**

**referred to the NYPD and Movant would be arrested. Four different law enforcement**

**agencies (ICE, FBI, NYPD, and DHS) failed to notice her re-entry, even though her**

**name would have been added to the various agencies' systems as early as February 14,**

**2016. EXHIBIT 49**

A. On July 19, 2016, Movant returned to Russia.

B. On or about July 22, 2016, or only three days after she left, the Nippes appeared at the 17th Police Precinct to file a police report claiming that Movant had tried to steal money from Nippes. The 17th Precinct was the one that arrested Movant in 2016 and in 2022.

**On October 10, 2016, when Movant next returned to the United States, she was arrested in the airport on the basis of a Misdemeanor offense that had exceeded the two-year statute of limitations required for Misdemeanor offenses.[35]**

A. Movant was arrested without an arrest warrant, by Mr. Ciuffi who was working for the Bronx, he took Movant from Queens to the 17th Police Precinct, located in Manhattan.

B. Movant was questioned at the airport prior to being read her Miranda rights. EXHIBIT 39

C. At the time of Movant's arrest, Judge Charles H. Solomon who presided over the case, had, on information and belief, been friends with Eliot Spitzer's for more than 35 years.[36]

---

[35] Movant's offense allegedly took place in June 2014, yet Movant was not charged until October 2016, well past the one-year statute of limitations required for petty offenses under C.P.L § 30.10(2)(d). Also note that the original Misdemeanor was lowered to a Petty offense.

[36] A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment. 22 CRR-NY §100.2(B). The level of discipline for judicial misconduct "rest[s] on our assessment of the individual facts of each case, as measured against the Code and Rules of Judicial Conduct and the prior precedents of this Court" *Matter of Duckman*, 92 N.Y.2d 141, 152 (N.Y. 1998)

D. Soon after, a New York Grand Jury voted to indict Movant on twenty (20) counts: count each of the crimes of Grand Larceny in the Second Degree and Grand Larceny in the Third degree for the extortion of Complainant I [Eliot Spitzer], and Four Counts each of the crimes of Forgery in the Second and Third Degree, Criminal Possession of a Forged Instrument in the Second Degree, and Falsifying Business Records in the Second Degree, as well as one count each of Attempted Grand Larceny in the Third Degree and Fourth Degree for crimes committed against Complainant 2 [Paul Nippes]. EXHIBIT 50

## Case No. 3: Nippes' Larceny

|  | Movant | Friend Name 1 | Was Nippes a Guarantor | DATES | Who paid the deposit? |
|---|---|---|---|---|---|
| Apartment No. 1 203 E 74 street | Main Resident | N | Y | April 2014, 3 days | Movant |
| Apartment No. 2 207 E 37 street | 3.15-6.1 | Olga B. Helped her to rent an apt. | Y | Jan, 13 2015 | Movant, Funded by Olga |
| Apartment No. 3 1125 Lexington Avenue | N | Volha K. Helped her to rent an apt. | Y | May, 15 2014 | Movant, Fundedby Volha K. |
| Apartment No. 4 55 W 26 street | Oct, 2014 - Feb. 2015 | Kristin S. | N | 2012-2016 | Spitzer |
| Apartment No. 5 26 Thompson Street | N | Irina P. | Y | June, 2014 | Irina P. |
| Apartment No. 6 234 E 88 st | Main Resident 6.14-10.14 |  | N | 6.16.2014 – 10.2014 | Movant |



**On or about July 22, 2016, two days after Movant signed the Settlement and Confidentiality Agreement, and had returned to Russia, the late Paul Nippes ("Nippes"), a resident of New Jersey, filed a complaint at the NYC 17th Precinct for an offense that allegedly took place in June 2014 in New Jersey.[38]**

That date is important because it means that the complaint had exceeded the statute of limitations for the alleged crime, which was, regardless, a New Jersey matter that had to be prosecuted by New Jersey law enforcement.

---

[38] The same precinct refused to accept a Spitzer-related police report alleging both forgery and rape, and the same precinct arrested her in current Brooklyn criminal case.

31

**The email to Nippes from Movant, asking for the return of her money, was also written in New Jersey where Movant lived with a friend in Hackensack.**

1. The Police had no authority to take the report after the statute of limitations had expired. Under New York law, a "prosecution for a petty offense must be commenced within one year after the commission thereof." NY CPL §30.10(2)(d).

2. ADA Mr. Komondorea mentions at least four (4) different signatures on the leases, but Movant only signed one (1) lease with Nippes — the lease for 203 E 74 street apartment — not four. The *one and only* lease she signed with Nippes acting as guarantor, Movant paid for the rent and deposit with her own money, which was not repaid to Movant, but to Nippes.

3. The other three (2) apartments were rented for Movant's immigrant friends, Olga B. and Volha K. who also knew Nippes, and by virtue of their immigrant status did not have social security numbers or even bank cards, and therefore they asked Movant for help.

4. In the EXHIBIT 64, we see that the Murray Hill apartment at 207 East 37th Street was rented via Citi Habitats, and the lease was hand signed, unlike most leases which are now electronically signed. Movant signed the lease in front of the Citi Habitats agent with her friend, who asked Movant to help her with the apartment.

5. After signing the lease, Movant left. In order to have committed forgery, the Citi Habitats office would have had to have witnessed the forgery and conspired to commit fraud, which is highly implausible. Movant's friend, for who the apartment was rented told her that Nippes was coming and because Movant did not want to speak to Nippes, she left before he appeared, leaving the City Habitats agent and Movant's friend in the office. In case with Movant, We thought Nippes just helping Us, but when he requested sex and Movant refused, Nippes didn't return money for security deposit and threw out our belongings. In addition, prosecutors knew, as they had evidence in their possession, including checks from Nippes, that Movant tried to get her own money from Nippes which had been returned to him by the landlord's managing agent at 203 East 74th Street ("Lenox Hill") in May 2014. However, the money was initially paid to the management by Movant before she moved into the apartment. Prosecutors knew that Movant did not attempt to steal the money, but that she sought the return of her own money from Nippes, and that the apartment in question was not the Murray Hill 207 East 37th Street apt 5J, which was rented on May 15, 2014, but the Lenox Hill apartment on 203 East 74th Street apt. 5c.

6. The management of the Murray Hill apartment at 207 East 37 Street stated in their court filings EXHIBIT 63 that they met with Nippes in person before December 11, 2015. Therefore, Nippes was aware that the apartment in question had his "forged" signature, as he claimed he did not sign the lease.

A. The Police accepted the report despite the fact that it had exceeded the statute of limitations for the alleged crime, and it was out of jurisdiction. EXHIBIT50[39]

B. Nippes claimed the debt was on his credit report, but the debt was always Movant's — not Nippes. EXHIBIT51

C. ADA Komondorea stated that Movant's prosecution wasn't time barred even though Movant wasn't in the country. However, Movant's then attorney Adam Miller, who inquired about Movant's belongings, was in communication with Bronx ADAs Walsh and Boyle. EXHIBIT52.

D. The case cannot be formally prosecuted after the statute of limitations expires.[40] Despite the fact that Movant was not in the country, a part of prosecution such as a warrant for arrest, still could be issued by the Bronx in connection to Spitzer or Manhattan in connection to Nippes, but Movant was arrested at JFK airport without a warrant of arrest by a Detective from the Bronx, who brought Movant to the 17th Police Precinct in Manhattan. No warrant of arrest was ever issued. EXHIBIT53EXHIBIT 54

E. Formal charges were brought only on October 10, 2016. Prosecutors could have issued a warrant of arrest or have convened a grand jury. The warrant of arrest wasn't filed on purpose so as not to divide two criminal cases, which would possibly have lowered Movant's bail as well as led to different trials, which would have been unfavorable for their client, Spitzer.

---

[39] Original Nippes Complaint filed on July 22, 2016.

[40] According to Merriam Webster Dictionary, prosecution is defined as: "the institution and continuance of a criminal suit involving the process of pursuing formal charges against an offender to final judgment".

The Hon. Judge Michael J. Obus, as Administrative Judge, Supreme Court, New York County

    signed an Amended Order, also pursuant to County Law 701, dated October 14, 2016,

    relieving the New York County District Attorney's Office, and appointing the Bronx County

    District Attorney's Office (BXDA) as a Special Prosecutor in the "Matter of an Investigation

    into Svetlana Travis Zakharova and Eliot Spitzer and a Second Individual". The date of the

    case in regards to a guilty plea was officially allowed to be prosecuted by Bronx only on

    October 14, 2016.

While the order dated February 17, 2016 covered only the "events" of February 13, 2016, this

    amended order authorized the BXDA to investigate and prosecute the crimes covered by

    Indictment 4243/2016. EXHIBIT 55

This means that not only was the police report out of statute of limitations, but the prosecution as

    well. Even questioning Movant at JFK airport regarding the Nippes case was illegal, because

    Detective Ciuffi, assigned from the Bronx did not have any authority to do so. The police

    report was filed in the 17th Precinct.

The date of the crime in the indictment is indicated as February 13, 2016. Bronx was appointed

    officially on February 17, 2016. However, a discovery from Movant's computer by the

    Bronx was dated February 15, 2016. EXHIBIT 57

Despite stating that Spitzer's lawyer, Kaufmann's complaint about extortion to Bronx in July

    2016, the Bronx, for some unknown reason, also subpoenaed the phones of Spitzer's ex

    lovers L.Smith and K. Smith (who is not related), as well as her boss.

On Tuesday, October 11, 2016 the BXDA notice of Grand Jury by ADA Boyle was not given to

    Movant's counsel by Boyle. Movant's official appointment of Bronx upon both cases was

Bronx only on October 14, 2016. Moreover, ADA Boyle used the NYDA form to give notice of the Grand Jury, even though ADA Boyle was officially working on behalf of the Bronx, and had been put on the case to avoid any conflict of interest with the NYDA. EXHIBIT58

F.  On December 6, 2016 Christopher Wright, Movant's second attorney, requested a Bill of Particulars to find out the dates of the charges, but they were never provided to him.

G.  Instead, on March 17, 2017, the Bill of Particulars was provided to Atty. Joe Murray, Movant's third attorney (see The Trial Lawyer below) who failed to provide Movant with any documents while she was in jail, including the charges that were filed against her.

H.  Material evidence such as checks with Movant's forged signature as well as the use of the apartment involved in a guilty plea were known to be false: The apartment referenced in the guilty plea is 207 East 37 Street Apt 5j, New York, New York 10016 ("Murray Hill"). But Movant asked Nippes to give her *her own money* back in regard to an apartment located at 203 East 74 Street 5C, New York, New York 10021 ("Upper East Side") of Manhattan.

I.  Moreover, Nippes a co-signer at 203 East 74th street apartment had removed Movant from there after he was notified by the building management that there was a strict no pets policy, and that Movant could not bring her dog there. (The broker had failed to inform either the Movant or Nippes about the policy.) Movant lived there just 2 days. Nippes came from New Jersey and threw Movant's belongings as well as furniture on the street

J.  Movant never forged Nippes' signature. Instead, she rented an apartment on 234 East 88 Street, New York, New York 10128 ("Yorkville") on June, 2014, *without using his guarantor's documents*. After a conference with Management at the prior apartment, they said that the Movant was required to remove everything from the Upper East Side apartment. Movant told Management she would not move out until they returned her first month's rent and security deposit as well as her brokers fee, for a total amount of $11,000.00. Management said they would return the money to Nippes, the guarantor, by check and if Movant was in the apartment in next 48 hours they would call Nippes' wife, and notify her about Movant.

K.  After Nippes threw out Movant's furniture and other belongings, and Management gave Movant's deposit check to Nippes. EXHIBIT 59 p.4 Nippes informed Movant in June 2014 that he would not give her any money from that check, and he kept the money.

L.  The prosecutors had the check in their possession during the time they investigated Movant's alleged crimes, and they had enough evidence to find out that the apartment upon the guilty plea was taken, and did not have any rent owed on June 2014. EXHIBIT63.

M.  The date of occurrence in the police report is also incorrect. Prosecutors claim forgery occurred through July, 2 2015. EXHIBIT 62. The date of the lease signing on the Murray Hill apartment was April, 2015. EXHIBIT 64 The date when Movant last spoke to Nippes was June, 2014 by email. Prosecutors, again, conspire in order to accuse Movant of things she did not do.

N.  It is unclear why the Murray Hill apartment had $18.000 debt because the judgment was in notice of petition that Movant does not need to pay any money. EXHIBIT63

O. The evidence of Nippes' documents on Movant's computer was procured in violation of Movant's rights. Movant has never claimed that she never had the documents on her computer. She has instead said that they were Nippes' original documents, and that she had not deleted the documents from her computer, but had not modified them, prior to the illegally obtained search warrant.

P. The lease was signed by hand in front of a Citi Habitat agent at their office. Movant signed her part of the lease and left. Movant's friend, who initially asked for help due to not havin documents to rent the apartment, stayed and waited for Nippes. Movant did not speak to Nippes after he threw out her belongings. EXHIBIT64

## The Trial Lawyer

Atty. Joseph W. Murray first contacted Movant on December, 24 2016 while she was at Rikers, claiming that Wright was known to be incompetent, and explaining that he had read about her case, and wanted to represent her because he felt badly for Movant after reading about her case in the newspaper. Since Movant had limited funds, she released Atty. Christopher Wright, whom she was paying out of pocket, and Joseph Murray became her attorney of record.

Over time, however, Movant realized he was not acting in her best interest. On/around August 2017, Murray let it be known that Paul Nippes agreed to drop the case if Movant paid Nippes $25,000, but Movant told him no, because she didn't have these kind of funds. The money supposed to cover unpaid rent that appeared on Nippes Credit Report as well as Nippes' legal fees. However, when Movant was released she saw the debt appear on *her* Credit Report, and the debt never belonged to Nippes.

At present, Murray prefers that Movant speak to him through his lawyer. This information was provided to Movant by Spitzer's lawyers. EXHIBIT65

In December 2018, Murray encouraged Movant to do an interview with NY Post, saying that they are the only ones who had courage to write Movant's truthful story and that his longtime friend Larry Celona would write the truth. The interview was done by telephone while Movant was in Russia. Murray was supposed to be on the phone, too, but last minute he cancelled his appearance, and Movant was interviewed by Celona. Movant told Celona about that Spitzer had both assaulted and sexually abused her, but this information wasn't included in the article. Instead, the article's focus was on false claims that Movant was a sex worker and the NY Post printed only those statements that would comply with allegations against Movant, such as Penal Law Section 135.65, threatening to expose embarrassing secrets about a person unless one is paid money, which is absurd. No 20+-year-old woman would willingly hide in a suitcase or engage in sexual conduct involving the use of sexual devices with a man more than twice her senior without coercion.

Yet Murray conspired with Spitzer's team as well as the NY Post and the interview was presented exactly as though Movant were exposing embarrassing secrets, however Movant only wanted to tell her side of the story, and reveal unwanted sexual acts that Spitzer ordered her to do under death threats against her and her family. That, however, was the only occasion on which Movant spoke to a journalist, despite ADA Boyle's claims. EXHIBIT 67

7.  In January 3, 2019, Murray also encouraged Movant to give an interview about Spitzer to the television show *Inside Edition*. Movant had little income, and *Inside Edition* said if she agreed to sign a contract for an exclusive interview with them, while promising to not speak to any other media, they would pay her $5000.00. EXHIBIT68 The agreement was obviously in violation of Movant's constitutional rights, but Murray supported that and he did not confront the Media of non-payment to the Movant, while confronting Movant of providing B-rolls videos for them. EXHIBIT69, EXHIBIT 70

Atty. Murray also failed to:

A.  Provide Movant with access to the discovery in her case,

B.  File a motion to reduce the charges before the statute of limitations expired,

C. Draft a motion to dismiss charges based on forgery evidence unacceptable to the court,

D. Inform her of how the plea bargain could impact her immigration status — all while falsely counseling Movant that a guilty plea could *not* be changed even while fully aware of the expired-statute-of-limitations 440 motion option EXHIBIT 71

Murray had known Herman Weisberg, the Sage Intelligence owner who Spitzer had hired to help retrieve Movant's along, only for him to accuse her of extortion in a NY Post article "Why hookers only want high profile men," published on April, 4 2016.[41] He lied to Movant that he never knew who Weisberg was despite putting Weisberg's company logo on his website and despite working with Weisberg at the same Police Precinct in Queens in the 1990s. EXHIBIT73

Movant had no control over what her lawyers did and which motions they filed. All of Movant's legal papers were kept from her until she visited the Supreme Court in 2020 and asked for her case file, which she had previously been searching for in the Bronx, given that her criminal case had been assigned to the BXDA. Note that this "information block" was further exacerbated because so many documents in the case were sealed.

On December 5, 2022, Movant released Atty. Joseph W. Murray as her legal representative in Travis v. Spitzer, Movant's current Supreme Civil Case. Although he had nominally served as her attorney from December, 24 2016 to December 5, 2022, on information and belief, he had repeatedly acted contrary to Movant's best interests, making it logical to infer by the time of Movant's release of his services that he had a conflict of interest with either Mr. Spitzer, or one of Mr. Spitzer's representatives.

Atty. Murray missed many deadlines:

---

[41] https://nypost.com/2016/04/04/why-hookers-only-want-high-profile-men/

A. He claimed he did not have time to review the discovery together with Movant in regards to Civil case against Spitzer from August 2022 until December 2022, yet failed to notify Movant of possible missed deadlines.

B. When Movant received a quash of a subpoena response in the case v. Plaza Hotel in November 2022, Atty. Kaufmann stated that there was a discovery obligation and a deadline for Movant and Spitzer, and it was only then Movant found out that she was about to miss a deadline.

C. When Movant asked Murray to adjourn the Court date for discovery because Murray didn't have time to review it, Murray responded he did not have time to file letter to the court. *Yet he expressed desire to represent Movant in current criminal case in brooklyn.*

D. Movant's current 440 motion was scheduled in November, 2022 and only in January, 2023 he expressed a desire to "help" Movant with this motion by making an appearance. Yet when Movant asked him to file it back in 2020, and he did not and also failed to file a letter to the NYSEF electronic system. Murray intentionally wanted to cut an ineffective assistance of counsel" option by interfering with this motion and not let Movant proceed with it successfully. EXHIBIT 75

E. Murray stated in his motions to the court that it was Spitzer who yelled "What paying you for?!"while Movant never said this to him. He did it purposely to represent Spitzer'sassault like Movant simply didn't provide sex services to Spitzer, which he paid for, and thus got angry.

F. In another court filings Murray wrote "It was the first time Travis refused from having sex with Spitzer"while Movant told him about Spitzer'smisconduct and he knew it wasn't the first time.

Murray was aware of Spitzer's forged signatures and yet did not proceed with any motions to dismiss the charges and thus lower Movant's bail based on this charges. He also did not provide any evidence to Movant while she was in jail.

In Movant's current civil Supreme Case, which Movant brought pro se in December 2020, Murray stated that the complaint wouldn't be accepted by the court, he does not see a case there, and that Movant didn't have grounds. Yet he decided to step in to the case and help Movant in April 2021. When Movant asked him for a permission to be a part of court proceedings and look at the filed papers, he said that Movant must request that of the court. When Movant made the request, and received the answer that her lawyer must make the request, Movant asked Murray, but he did not have time or did not know how to request it, even while he was fully aware that Spitzer's team was requesting precisely that. EXHIBIT 76 EXHIBIT 77 EXHIBIT 78

Murray did not provide Movant with files from her criminal case for two (2) years, and when he did, he failed to provide at least fifty percent (50%) of the files compared to what he had provided after he had represented Movant in the Civil Case against Spitzer in his subpoena request by Spitzer's lawyers.

## The Trial Evidence

It was stated that that "[D]efendant expressed a sudden desire to leave while being escorted to the office of DA of Manhattan." It is not noted, however, that Movant was sitting at the police station without warm clothing on a cold February night[42], and that a police report, which must be taken, by law, within a time period of 1–2 hours maximum was instead taken

---

[42] [42] The coldest Valentine's Day in New York City's history: https://abc7ny.com/record-low-temperature-cold-central-park/1201463/

over the course of 12 hours – from 9 PM on February 13, 2016 until 9 AM of February 14, 2016.

Movant was also notified after writing her complaint that she needed to sign the complaint at the police precinct, and once she entered the location, she was confined to the police station for hours, staying during a shift change of Police Officers, even while Movant was still there unable to leave, and the document for signing wasn't given to the Movant during these 12 hours at the Precinct.

Movant hurt continuously as she was 12 weeks pregnant and, on information and belief, Spitzer's abuse contributed to a miscarriage she had later that same day after boarding a plane to Russia on February 14, 2016.

It is unknown, even considering the enormous cover up and corruption from Spitzer's friends in the legal system, why the Police didn't arrest Spitzer. Somehow they, without an investigation or complaint by Spitzer, took Movant's clothes and phones, and lying under penalty of perjury claimed that Movant stated that Spitzer tried to destroy her laptop in order to search for possible misconduct of hers.

## The Plea Bargain

Movant's Domestic Violence report naming Spitzer was never prosecuted. On the contrary, Movant's report was immediately assigned to the BRAM office that handles robbery cases — instead of the Domestic Violence office — and she was deemed an extortionist.

The Unapproved Police Statements, moreover,  Officer Ciuffi not only lied about Spitzer trying to destroy Movant's computer, but he also lie about Spitzers passing Movant a few hundred dollars just before Movant was taken to the hospital by EMS on February, 13 2016.

On the night of the police report, they all (Officers Ciuffi and Palam, and Spitzer or his representatives) conspired. Spitzer's text to Movant saying "You have lots of cash" while fully aware that he had torn apart Movant's money was yet another attempt to disguise the original lies .

Movant did not have any money at all while at the precinct, at JFK and in the airplane. In front of six (6) workers, two (2) EMS workers, four (4) police officers and Spitzer, Movant was told that she needs to come to the hospital with EMS. Movant refused. Then EMS said that they will have to take her anyway, and she either needs to dress up or they will take her just like that – in ripped off pajama, and without shoes. Movant took off her ripped by Spitzer pajama and got dressed. She was escorted to the ambulance and transported to the Hospital, with only two belongings: her passport and her green card. Yet no cash or any requests for money were made. Yet rather than investigating Movant's assault, the Robbery Department without any signs or complaints of robbery immediately began investigating robbery instead. Pajama was never a part of the safekeeping belongings as well as Movant's bank cards and ripped off cash.

Upon information and belief, and relying on Nippes' Police Report, Paul Nippes did not say anything about Movant committing "attempted petit larceny" in June 2014 by email. Instead, he complained to Police about collections, which had added a debt to his credit history for $18,000.00.

The police, conspiring with Spitzer, had already searched Movant's computer by then, which they had obtained from the Plaza Hotel after the night of abuse. The goal was to find any evidence of extortion and to combine the two cases together to accuse Movant of extorting "White Business Men" while being fully aware that Movant was, in fact, the victim, as shown, in Spitzer's case, in the video from the Plaza Hotel, where Movant was crying, shaking, barefoot standing in the lobby at the hotel for at least 10 minutes, and as shown in Nippes' case, by evidence of Nippe's email that clearly says it was he who threw out Movant's furniture and did not return her rent deposit, which was paid with her own money — not Nippes — to the management of the Upper East Side apartment.

It is also noted that Police obtained a "door log" at the Plaza hotel and found out that the door was shut three (3) times from 7:49 PM to 8:43 PM. Movant complained that Spitzer did not let her leave the room and it was a proof of her statements to the Police. It is also noted that Police Officers Matthews and Carrado were ordered to stay outside the room "Until Spitzer returns" EXHIBIT 80, p.4

The Bronx DA could not prosecute charges related to Nippes. Originally, the Bronx was assigned because Spitzer's conflict of interest with the then DA of Manhattan Cyrus Vance, his friend.

Nippes, in contrast, did not have a conflict of interest with Manhattan DA and his original police report was filed with Manhattan's precinct yet, on October, 20 2016, the Bronx DA was officially assigned to prosecute Movant in the Nippes Case.

Even if the statute of limitations were irrelevant because Movant was in Russia between February 14, 2016 and October 10, 2016, and Nippes' case was not yet prosecuted, on

October 20, 2016, the case in regards to a guilty plea was prosecuted (a/k/a initiation of criminal proceedings) long after the statute of limitations passed, just as the police report was accepted after the statute of limitations.

The People's defense that Movant was in Russia cannot be counted, as the prosecution had yet to start. Prosecution only started after Movant came back to the USA on October 10, 2016.

The Murry Hill apartment cited in the guilty plea (207 East 37 Street) was rented on May 15, 2014. It was also never intended for, or used by, Movant. In June 2014, no rent was yet owed because Movant used her friend's money to paid four (4) months' rent: first month rent and three (3) months security deposit, to allow an immigrant friend to live there despite the fact they didn't have the documentation to rent on their own.

The lease had to be signed by hand, and Movant signed her part of the lease. It was signed in front of a broker agent, in Citi Habitat's office. There is no way that Movant, the broker agent Citi Habitat office and Movant's friend conspired all together to forge Nippes' signature. Nippes was aware of the apartment and once Movant signed her part of the lease, she left in order to avoid seeing Nippes, because he had thrown her furniture and clothes out a few weeks prior and owed Movant money for the loss, which he did not return.

Atty. Wright in a previous motion asked for the time and dates of the alleged crimes. His motion was denied.

# THE POST TRIAL INVESTIGATION

## Relevant Civil Lawsuits

Travis vs. Spitzer 101124-2020 Supreme Court
Travis vs. Bank of America, NA 1:2022cv10102 Federal Court

## Case No. 4: The Tanarvska Robbery

In October 15, 2021 Movant moved to 211 Brighton 15th ("Brighton 15th") Street, Apt 2F,

Brooklyn, New York 11235 with her husband and two children, a daughter who was then 6

days old and a son who was then 2 years old. The same day, a Downstairs Neighbor from

apartment 1F started to put on loud music, turning up the bass, day and night repeating the

same song. Meanwhile, the Upstairs Neighbors from 3F walked heavily and jumped at night

and early morning, knocking onto the pipes until they heard Movant's kids cry. The walls

and floors were not noise resistant and every noise echoed because the apartment had an

open space design.

Because of the noise, Movant asked management to move to a different apartment, they said the

anrtment will be read in 1 month. Within a month she was told that the new apartment wasn't

ready for occupancy, and that leaks had to be fixed.

Movant then noticed the neighbor from 4F moving out, and asked to be relocated to the same

apartment. Management agreed and raised the rent of the new apartment.

During Movant's tenancy "the Tanarvskas," a couple who lived adjacent to 4F, approached

Movant and Movant's husband and threatened to evict them. Movant was scared for her and

46

her family's safety and wanted to move out immediately, but her bank account was then frozen by CitiBank, so Movant did not have ready access to money for about 6 months. (Movant sued the bank and her claim was settled.)

During seven (7) months of tenancy, the Tanarvskas called the police on a daily basis alleging child abuse every time Movant's newborn daughter cried. Eventually, after some twenty (20) allegations, the police referred Movant to ACS to investigate child abuse. They referred Movant to the NYC Administration for Child Services (ACS), and ACS started to visit Movant on a weekly basis. Movant and her husband were cleared of all child abuse allegations.

The Tanarvskas next complained to the Police that Movant and her husband were harassing them. On December 27, 2021, while Movant was walking with her husband and two kids on the boardwalk, approximately 500 meters away from their building premises, the Tanarvskas tried to get management to evict Movant and her family by telling management and the landlord that Movant and her husband had stolen their phone.

According to the police complaint, during an argument on the boardwalk, the Tanarvskas stole Movant's iPhone 12 Pro Max and hit Movant and her husband, which occasioned both the police report and the need for one of the Tanarvskas to visit a doctor *for 3 minutes*.

While Movant still hoped to get her phone, one of the Tanarvskas called the police and proceeded to complain of abuse by Movant's husband, who was holding the stroller with two kids or holding their two-month-old newborn daughter trying to calm her at the time of his alleged abuse. Both a witness and a bystander on recorded video told the Tanarvskas not to

abuse Movant and her family after seeing Halyna Tarnavska hit Movant and her husband from behind.

Movant, fearing another sleepless night due to ongoing banging by the Tarnavskas went to Manhattan to sleep at a friend's apartment. While in Manhattan, Movant complained to the 17th Police Precinct that the Tanarvskas had abused her and her family on the boardwalk. This complaint was written using a misspelled version of Movant's first name: Instead of Svetlana, the report says "SvetHana".

The precinct was the same one that had arrested Movant in connection to false allegations by former NY Gov. Spitzer in October, 2016. Movant didn't know that this precinct had arrested her in 2016 criminal case due to Atty. Murray failing to provide documents of Movant's criminal case. When Movant complained to this police in regards to neighbor abuse, the complaint was taken by Det. Stephen Ennis.

On December, 28 2021 Ennis wrote to Tarnavskas to confirm Movant's and Movant's husband's photos.

Just a few days later, on January 5, 2022, the detective came from Manhattan to Brooklyn to arrest Movant without investigating her complaint, while using his retired police officer shield number, rather the one identifying his then current rank of detective. (In 2023, Det. Ennis was promoted to Sargeant.)

**Although the NYPD 17th Precinct from Manhattan was investigating the Tanarvskas' complaint, Movant's apartment building is located in Brooklyn's 60th precinct.**

A. This new criminal case was almost certainly started on Spitzer's orders at the same precinct that:

   i. Arrested Movant in 2016;

   ii. Refused to accept Spitzer-related complaints;

   iii. Accepted complaints from Nippes from outside Manhattan's jurisdiction and outside the statute of limitations.

B.  Spitzer is trying to remove Movant from the United States by (1) starting removal proceedings against her and adding on (2) an additional criminal case. Conviction in the second case as well as the first would result in a lifetime ban barring Movant from entering the county and upon leaving the US the new conviction would bar Movant's entrance.

Once the Tanarvskas[43] complained to the police, and Movant was arrested, it gave them more leverage to harass Movant and her family. For example, they started to spread completely false allegations about Movant's and their current criminal matter among Russian parents on a closed Facebook group[44], speaking to Movant's daycare Principals and other parents whose children attended the same daycare as Movant's children.

The Tanarvskas also complained to management, and management started an eviction process against Movant.

Sometime in May, 2022, Halyna Tarnavska complained to police that Movant beat up their dog on the building premises and this violated an order of protection.

During a calm weekend morning approximately five (5) cars with twenty (20) police officers surrounded the building where Movant lived with her family. Police officers were on the second floor, third floor, on the stairs and around the building. While police officers were interviewing Movant, the Tanarvskas came to the 4th floor, where Movant lives, to record

---

[43] Tarnavskas are lesbian couple, they do not have kids

[44] Facebook group that required admition by Administrators

her with their phones. They intentionally made Movant violate the order of protection against
them by standing next to Movant and filming her communication with the police.
Fortunately, cameras showed that Movant didn't even touch their dog and the police left,
confirming the fact that Movant didn't violate an order of protection.

Other false complaints made by the Tarnavskas included a claim that there was a fire in Movants
apartment, which eventually caused the FDNY to break Movant's apartment door and find
out that no smoke or fire was taking place. After the FDNY broke the lock and the door as
well as part of the wall, Movant was scared to live at the apartment without proper security
such as a door or a lock. Management notified Movant through the superintendent that it
would take a few weeks to install a new door.

The only place Movant was able to find to stay was on a boat at Bergen Beach where she
relocated with her two small kids for one-and-a-half months during summer time. Short-term
rentals weren't available, and nobody wanted to rent to a family with two small kids. Even
shelter wouldn't accept Movant because, by the law, they only accept homeless people but
Movant still had a lease and an apartment and technically wasn't homeless. It took one-and-
a-half months for landlord to install a new door and the lock. By the time the new lock was
installed Movant had rented another apartment.

## Case No. 5: Part 1–Immigration

8. **On February 2020, Spitzer's name was found on Movant's immigration removal case
   folder, even though he was never mentioned in her removal case. EXHIBIT 31.
   Somehow matters that are attached to Movant's immigration case are deemed Spitzer's
   matters. EXHIBIT 32**

C.  As of July 31, 2019, Movant's removal proceedings are subject to a bar from entrance, which can be either five years, ten years, or for a lifetime. Movant's Misdemeanor B in this criminal proceedings involves Crime Involving Moral Turpitude (CIMT) and upon decision on removal involves a lifetime bar.[45]

D.  There is no coincidence that the date of the crime marked February 13, 2016 was not the date of the crime Movant pled to, which was June 2014. An Immigration Ban counts only after admission of an alien to the country. Movant was admitted (got her green card) on December 24, 2014. EXHIBIT 32

E.  What Movant pled to happened prior to her admission in June 2014. EXHIBIT 33 EXHIBIT 34, EXHIBIT 35 To all appearances, that was part of a larger strategy. An all but certain result of a $1 million bail was a long detention in jail since Spitzer knew that Movant could never pay that sum. An equally all-but-certain result of a year-long detention was that Movant would accept a plea that adversely impacted her immigration without her fully realizing it, especially with the counsel of an attorney who was not working in her best interests. That, in turn, would make it that much easier to remove Movant from the US on the basis of Crimes Involving Moral Turpitude (CIMT), which appear to have been the Spitzer's goal from the beginning.

---

[45]  A person who is subject to the grounds of deportability is deportable for one or more CIMT convictions that occur after admission i.e. getting green card, as long as they do not arise from a single scheme of criminal misconduct. INA § 237(a)(2)(A)(ii), 8 USC § 1227(a)(2)(A)(ii). A conviction always is required for the CIMT deportation grounds; admitting the conduct will not cause deportability. Being convicted of an offense that is not a CIMT does not affect this analysis; only CIMTs are counted.

F.  By law, however, date of the crime had to be brought on June 2014, not Spitzer-related charges on February 14, 2016.

G.  But even Spitzer-related charges appear to have discrepancies in dates. Upon indictment Bronx deems extortion started in 2014.  EXHIBIT 36[46] Another date of crime is listed as February 14 or 15 of 2016 EXHIBIT 37 while the date of crime on WebCriminal website is listed as February 13, 2016 EXHIBIT 38. The dates of Spitzer's extortion are listed from March 2010 until October 2016 EXHIBIT 39. Even Spitzer cannot locate the year of his victimization— 2013 or 2014? EXHIBIT 40.

9.  **Supreme Court Civil Lawsuit where Spitzer was seeking $1.00 in damages for $400,000 grand larceny extortion that Spitzer filed against Movant, claiming she had extorted him between 2014 to 2016 by threatening to expose their relationship to his family. EXHIBIT 41 Upon information and belief the case was initiated as a substitute of police report, which Spitzer describes as a valid referral to law enforcement. EXHIBIT 49**

H.  Spitzer stated to Movant that this case would be referred to the police for the prosecution of Movant, and Movant arrived in New York from Russia despite numerous travel alerts in order to sign his Settlement and Confidentiality Agreement.[47] EXHIBIT 42

---

[46] Spitzer related charges shown as March 2014 – October 2016. Yet in October 2016, MovantMovant's mother did not receive any forged check(s) by from Spitzer.

[47] In the early days of their acquaintance, Spitzer told MovantMovant his name was "Tom Greggs."

I. In February 2023 Movant requested the case be reopened due to many errors in filing discontinuance, EXHIBIT 43 but Spitzer opposed Movant's request, calling it harassment. EXHIBIT 44. The case was then transferred to current Judge Hon. P. Goetz and, upon information and belief, it is now sealed.[48]

10. **Movant is now under Removal proceedings, and if convicted in the Tarnavskas case, she would be subject to in lifetime ban in the United States as well as restriction from the entrance to the US upon leaving the country.**

11. In October, 2017, one year after being in jail, Plaintiff had pled to get out of jail and was offered a Misdemeanor B, attempted Petit Larceny with 90 days in jail as time served. A Crime Involving Moral Turpitude (CIMT) does not involve deportation, TWO or more CIMT involve removal proceedings, deportation and a LIFETIME BAN FROM ENTERING THE US.[49] Movant's clothes. Passport, green card and all belongings were destroyed by Bronx.[50] EXHIBIT 14

---

[48] Unsealed case against Movant's alleged extortion was fine online and to public access but when Movant decided to proceed with the allegations in Spitzer's complaint he immediately opposed and sealed the case.

[49] A person who is subject to the grounds of deportability is deportable for two or more CIMT convictions that occur after admission i.e. getting green card, as long as they do not arise from a *single scheme of criminal misconduct.* INA § 237(a)(2)(A)(ii), 8 USC § 1227(a)(2)(A)(ii). A conviction always is required for the CIMT deportation grounds; admitting the conduct will not cause deportability. Being convicted of an offense that is not a CIMT does not affect this analysis; only CIMTs are counted.

[50] The necessary measure of protection for government documents and records is provided by 18 U.S.C. § 2071. **Section 2071(a) contains a broad prohibition against destruction of government records or attempts to destroy such records.**

12. It is clear that Bronx DA as well as ADAs were initially guarding their client, Spitzer. Movant already has two CIMT since her guilty plea covers two "criminal" cases – Spitzer and Nippes. EXHIBIT 81 p.9 It was a thorough strategy from the beginning of Movant's police report. First take away her computer. Find possible men that would also claim similar charges that Spitzer initiated[51]. Try to find anything possible at all that could be used against Movant.[52] EXHIBIT 83  EXHIBIT 82[53] Accuse Movant clearly seeing evidence of their misconduct. Accuse in CIMT and better yet to have more CIMT – this current indictment covers two criminal cases, therefore two crimes not arising from two different schemes of criminal misconduct – such as needed for removal of Movant. The date of the crime was put as February 13, 2016 unlike in the indictment and official papers and plea that Movant pled to states June 2014, in regards to Nippes crimes and as early as 2010 in regards to Spitzers crimes. The original dates were unfavorable for their client, Spitzer who initiated the removal proceedings of Movant long before they were initiated officially, in July 31 2019, again at JFK airport. The date was picked up specifically as the date was after Movant's official residency date – which was December 20, 2014. CIMTs that happen before official legal

_____

[51] Give example of Nippes and Hence

[52] For example, on March 8, investigators conducted a computer search of Movant's friends, while she was marked as "Victim", contacted Orange police department in regards to Movant's University trespassing report, which she was simply trying to get her computer from security at school, which by some reason was written for NY Investigation

[53] P.3 of this EXHIBIT show that leading investigator Sergeant Giuffre wrote lies in his investigative report. On February 29 he wrote as Movant threw objects at Police Officer and broke a Police car window with a trash can. Later it was writes as "EXHIBIT of deadly weapon". Movant's real estate agent was described as a woman who rents room for prostitutes. The agent was later subpoenaed and deposed as well as all of her bank accounts. Movant's script co-writer was presented as a benefactor or client. March 15 2016 note says that they even did not attempt to interview Spitzer.

residency do not count towards removal, deportability and ban of an immigrant, thus do not interfere with Immigrant's lawful status. Only CIMTs that happen after obtaining residency status count, therefore the date of the crime written as February 13, 2016 is needed for Spitzer to remove Movant permanently.

13. In 2018, Movant got her green card after Bronx destroyed it, as well as travel passport, that allowed Movant to remain in Russia for longer then six (6) months and not travel back and forth to the US to support her residency status. Movant left the US in February, 2018 and remained in Russia until July 31, 2019. For 1,5 years Movant was absent from the states.

14. On June 13, 2019 Movant bought a ticket to New York. 7,5 months pregnant Movant came to the US and arrived at JFK airport. EXHIBIT 84[54]

15. On July 21, 2019 US Customs and Border Protection generated Query Result EXHIBIT 85 which conducted a search of Movant among all databases of FBI and in New York and California. The date of Movant's crime was entered as February 13, 2016 by a US Homeland Security worker at 18:32 pm. It is unclear why the search was conducted 10 days prior Movant's entrance to the country?

16. On July 30, 2019  a file was already prepared to remove Movant's green card.

EXHIBIT 86 [55]

---

[54] This EXHIBIT provides the date when Movant bought a ticket to New York.

[55] This EXHIBIT provides details of Bronx Investigation upon Movant, when Sergeant Giuffre lied in New York documents that Movant was "EXHIBITing deadly weapon" on University trespassing charges.

On July 31, 2019 Movant's green card as well as her Russian Passport was taken by ICE at JFK airport on basis of fraud and misrepresentation. The authorities claim she lied on her green card application when answering a question "have you ever worked as a prostitute?" Movant answered no. EXHIBIT87[56] EXHIBIT88[57] EXHIBIT89 [58] EXHIBIT90

## Case No. 5: Part 2–The VAWA Act

*Confidentiality Provisions*: Applicants and recipients of immigration relief under the Violence Against Women Act of 1994 (VAWA)[111] and the Victims of Trafficking and Violence Prevention Act of 2000[112] (T and U nonimmigrant status for victims of trafficking and other serious crimes) are entitled to special protections with regard to privacy and confidentiality. The governing statute prohibits the unauthorized disclosure of information about petitioners and applicants for, and beneficiaries of VAWA, T, and U-related benefit requests to anyone other than an officer or employee of DHS, the Department of Justice (DOJ), or the Department of State (DOS) who has a need to know.[113]

---

[56] This EXHIBIT shows that Movant's native Russian passport was taken illegally by ICE on July 31, 2019 and returned to her only on August 22, 2019. At 9 months pregnant Movant went to JFK to pick up her passport after numerous calls and requests to provide an explanation from US authorities on why her documents again taken from her. We consider this was an attempt of manipulation to proceed with Movant's interview and provide her with official notice of removal, so she would come back to JFK and official proceedings would be initiated against her.

[57] In this EXHIBIT on p. 2 we see that officer refers to Movant's i485 green card application.

[58] In this EXHIBIT we see that authorities were not in possession of Movant's i485 application and they ask her to bring it. Movant applied for her green card as VAWA petitioner and her application was approved.

*Exceptions: (1) The Secretary of Homeland Security or the Attorney General may*

*provide, in the Secretary's or the Attorney General's discretion, for the disclosure of*

*information in the same manner and circumstances as census information may be*

*disclosed by the Secretary of Commerce under section 8 of title 13.*

The authorities did not have access to Movant's i485 prior; she brought it to them herself in

August, 2019 in exchange for the return of her Russian passport. Upon information and

belief, Movant's atty. Murray gave authorities Movant's immigration folder. He passed it

along with his Discovery Subpoena to current civil case with Spitzer. When Movant asked

him how he obtained her immigration folder, he did not respond. Upon information and

belief Murray obtained it with Movant's former immigration lawyer, A. Plaksin, who was in

charge of Movant's Vawa case.

17. Movant's original application for permanent residency was signed on April 12, 2013. The

authorities removed Movant's green card stating she lied when answering "No" to the

question:

> Within the past 10 years have you been a prostitute or procured anyone for
>
> prostitution or do you intend to engage in such activities in the future?

Authorities also referred to an article in Medium which Movant never wrote herself, it was

written by her friend S. Friedman, and she was just a face of the article, that supposed to be a

pitch to potential publishers for a book and later TV series, she claimed she worked as an

escort in a fictional article. The article also stated that Movant appeared in sex business by

fraud when responding to an ad she appeared to be at massage salon, where she was forced to

give hand jobs with happy endings.

Yet again, authorities did not see the elements of sex trafficking and put Movant's date of

prostitution as February 24, 2016 by some agent on July 31, 2019 at 22-13 pm. EXHIBIT 91

The date was picked up again in their client Spitzer's favor. For instance, application for permanent residency Authorities refer to was signed on 04/12/2013. Authorities remove Movant's green card stating she lied when answered a question "Within the past 10 years been a prostitute or procured anyone for prostitution or intend to engage in such activities in the future?" Answer on application was "No".

18. The article stated that Movant's accidental experience in the sex business came about when she responded to an ad for work at a massage salon, where she was forced to massage the lower extremities of her male clients ("hand jobs") until they felt pleasure ("happy endings").

19. The article also claimed that:

> I arrived in New York City from Chelyabinsk, a city right in the middle of Russia, when I was 19 years old, with $300 in my pocket. I turned 24 in March and have managed to save $200,000 by fucking for money. I've traveled to Morocco, Paris, Beijing, and Monaco.

But Movant is from Ekaterinburg, and she first came to the US when she was 20 years old. Her travel records show that she has never been to Morocco, Paris, Beijing, or Monaco either at the time the article was printed. Movant also never have $200,000.00 savings in her account or engaged in "fucking for money".

20. Thus, the authorities relied on the "facts" of a fictional Medium article, printed on November 2014, which referred to past experience of "prostitution" that logically would have occurred *prior* to November, 2014.

**So why on July 31, 2019 at 22:13 PM did the CBP authorities write that Movant's date of prostitution began on February 24, 2016 when Movant was in Russia?**

Two days prior that date, on February 22, 2016 Spitzer, after Movant accused him of sex assault and domestic violence by filing a domestic violence report only[59] Spitzer, by taking Movant's bank card from NYPD "Safekeeping" conspiring with detective Palam, deposited a $30,000.00 check to Movant's bank account, upon information and belief obtaining Movant's password in her computer which was previously removed from her by lies of Detective Palam obtaining search warrant.

One day prior the listed date of Immigration officer, on February 23, 2016 as money were deposited to Movant's bank account, Spitzer wired $100.00 to Movant's mothers bank account in Russia by logging in to Movant's bank online and sending a wire to Movant's mother's bank account in Russia as Movant's mother's foreign bank was saved in Bank of America online banking due to prior money wires. Spitzer forged Movant's signature on the endorsement part and thus the check was accepted. EXHIBIT 93

Three years later, on July 31, 2019 a U.S. Customs and Border Protection (CBP) Officer at JFK Airport, while removing Movant's green card, cited her date of "prostitution" as the reason. That date was listed as February, 24 2016 during which it was claimed Movant was involved with a transaction for sex services at the Plaza Hotel. Movant provided her address to CBP officer Vidal at 17:55 pm on July 31, 2019 EXHIBIT 91

_____

[59] Movant was scared to accuse Spitzer of sex assault due to the fact that she was scared not only of Spitzer, but of authorities as well. Considering the way she was treated at the Plaza Hotel by them, with their force and disrespect to a crime victim, threats that they would take her to the hospital "as is" – in ripped off pajama, Movant only wanted to leave to Russia safely and without any further examinations. Movant never filed a police repost accusing anybody of sex assault, and she thought that it would be even longer then her simple report against Spitzer that took 12 hours.

21. On July 31, 2019, at 17:55 PM, Movant provided her address to Officer Vidal EXHIBIT 95 as 720 Second Avenue, New York 10016. EXHIBIT 94

22. Yet another officer at 22-13 filled out a form of Movant, providing addresses that are in this current criminal case – 207 east 37 street and 1125 Lexington avenue EXHIBIT 96 According to multiple authorities then, Movant's date of "criminal affiliation" is written as February 24, 2016, which was chosen as the "start date" of Movant's "prostitution" to correlate with Spitzer's smears against Movant. EXHIBIT 97 Conspiring with Spitzer, the authorities deny Movant's accusations of assault, falsifying the facts according to the BXDA's and Spitzer's story, and refuse to acknowledge that the fallen "Sheriff of Wall Street" trafficked Movant.

## **Requests for Discovery**

### Request for Forensic Document Examination

A. Movant requests forensic document analysis by an expert document examiner. At least 12[61] checks with Movant's signature were deposited in her bank account at Bank of America and wired to a third party Russian bank account at Alfa Bank.

---

[61] Unredacted bank statements must be subpoenaed due to heavy redaction by the current special prosecutors from the Bronx.

B. All of the following checks were deposited when Movant was not in the U.S. during 02/14/2016 – 10/10/2016.

   iv. On 2/22/2016, a check with forged Movant's signature was deposited in her bank account at Bank of America in the amount of $30.000.00

   v. On 3/25/2016 a check with forged Movant's signature was deposited in her account at Bank of America in the amount of $25.000.00

   vi. On 4/21/2016 a check with forged Movant's signature was deposited in her account at Bank of America in the amount of $5.000.00

   vii.    On 4/28/2016 a check with forged Movant's signature was deposited in her account at Bank of America in the amount of $50.000.00

   viii.   On 6/1/2016 a check with forged Movant's signature was deposited in her account at Bank of America in the amount of $50.000.00

   ix. On 6/17/2016 a check with forged Movant's signature was deposited in her account at Bank of America in the amount of $50.000.00

   x. Prosecutors obtained entire bank record (10[+] years) of Movant and saw the wires were send not to someone other then Movant bank account and the checks Spitzer deposited contained a signature and date of deposit was the same as check written. They accepted it as an evidence of larceny by extortion.

C. Video exists showing Spitzer making deposits in Bank of America. Further, the signatures on the checks are markedly dissimilar to that of Movant. This information was used against Movant in Spitzer's initial Civil extortion lawsuit for $400,000, later dropped by Spitzer in exchange for Movant agreeing to sign an NDA. EXHIBIT98[62] EXHIBIT99[63]

D. Movant requests forensic document analysis by an expert document examiner.

The lease was never signed by Movant. She put only her signature on the lease. Handsigned lease on 207 east 37 was not signed by Movant. As well as the lease on 1125 Lexington Avenue.

## Request for New DNA Testing

440.30 1(a) Where the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing deoxyribonucleic acid ("DNA") was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.

---

[62] One of the reasons Movant signed Spitzer's Settlement and Confidentiality Agreement was because Spitzer had promised his $1 lawsuit against her — not to be confused with the Nippes case — for extortion would be dismissed

[63] Prolonging the dismissal of the Civil Lawsuit was another tactic of Spitzer and Co. Right after Movant signed Settlement and Confidentiality Agreement, Spitzer's lawyer Atty. Kaufman complained to the Bronx DA Clark. If they dropped the lawsuit fast, Clark would not show "sufficient" time to prosecute and collect evidence of Movant's extortion.

Movant requests a new DNA test for the following reasons:

A. The findings of the original DNA test were false. The report does not contain Spitzer's swab at all. EXHIBIT 100

B. The allegation that Movant was then engaging in sexual relations using anal devices a/k/a dildos which were recovered from Plaza Hotel on February 13, 2016 with men other than Mr. Spitzer is false. The report is not a part of this criminal case, but it was done in connection to this criminal investigation. Movant had never seen the full disclosure of the OCMA DNA report. Movant requested the disclosure of full DNA results in her motion to unseal on March, 9 2023. The motion was denied as the new Judge does not know that this guilty plea covers both criminal cases as noted at Movant's Plea Minutes by Honorable Judge Solomon, upon who's decisions current Judge Hon. Swern relied to.

C. The allegation that Movant had engaged in sexual relations, using sexual devices with men other than Mr. Spitzer is also false.

D. Any use of sexual devices were used solely with Mr. Spitzer, with whom Movant had a long term relationship described in many criminal and civil cases as sex trafficking.

E. A new DNA test relying on samples extracted from other sexual devices Movant used on Spitzer by his sober and volunteer request will establish a clear connection to Spitzer's DNA and exonerate her from accusations of a long term extortion scheme as ADAs claim she engaged with Spitzer. As for now the date of crime is February 13, 2016 which has nothing to do with crime in Movant's guilty plea which was June, 2014. The indictment covers another related to the plea criminal charge, Movant demands DNA test of other sex toys related to Spitzer, a/k/a Crime Victim 1.

## Summation

## Prosecutorial Misconduct

23. A fundamental right provided by the Fourteenth Amendment is the guarantee of due process whenever the federal or state government's power is used to deprive an individual of life, liberty, or property. Due process requires the use of fair procedures before any deprivation can occur. The fair procedures required depend upon the type of deprivation that occurs."

24. The Plea minutes state that the plea covers two indictments.

    F. It is clear that when the Judge Solomon says: "Also, in addition to that, the People are offering you a B misdemeanor under an indictment charging felonies", Judge Solomon means Spitzer related charges.

25. Movant was sentenced to 90 days.

    G. It is the harshest penalty available, and it is only allowable if a Movant had already pled guilty, and been sentenced in a prior criminal proceeding to a misdemeanor, but the Movant had no prior criminal record.

    H. Movant's guilty plea was never provided to her in print as ADA Boyle alleges in his Answer. Movant was only told that this plea would get her out of jail. No paperwork, printouts, or any documentation whatsoever was provided to her by Atty. Murray.

26. When Movant's plea was entered in the Manhattan Supreme Court, the jurisdiction was improper and by information and belief the District Attorney was a friend of Spitzer's.[64] The

---

[64] https://www.nytimes.com/2016/02/18/nyregion/manhattan-prosecutor-asks-to-be-recused-from-eliot-spitzer-inquiry.html

fraud and coercion happened when Movant was prosecuted by the Bronx District Attorney, but her plea still took place in Manhattan, and her initial Domestic Violence report that must be prosecuted by special domestic crime victims unit was not prosecuted at all. Stating that her guilty plea was not coerced by anyone was an overly broad statement as her guilty plea was coerced by the judge, who by information and belief was a friend of Spitzer's, and refused to lower bail set at $1 million.

27. The date of the alleged crime has also been falsely listed on WEB CRIMS as February 13, 2016.

I. On February 13, 2016, Movant accused Eliot Spitzer of abuse at the Plaza Hotel. She filed a report at the 18th Police Precinct in New York City.

J. On June 2014, Movant is alleged to have committed Petit Larceny, to which she pled guilty in exchange for release from prison where she had been detained for one (1) year prior to sentencing.

K. Movant was similarly coerced by prosecutors who, by the time of the scheduling dates for trial, decided to change prosecutors for some unknown reason, therefore intentionally prolonging Movant's time in jail awaiting for trial stating that they need to look at the case again. The plea was also coerced by the Police, who decided to prosecute, charge, and accept a police complaint where statutes were time barred. It was additionally coerced by the court that denied Movant the opportunity to obtain any evidence at all, including grand jury minutes that she was legally entitled to. This denial was by Spitzer's friend, Judge Solomon.

28. Movant has the right to discuss Spitzer's charges, as her previous cases were denied by Judge Solomon in 2017.

29. Movant denies the allegations that she threatened to rape the children of former New York Governor Eliot Spitzer.

30. Movant states that she was raped, harassed, abused, coersed several times by Spitzer before his abusive behavior became public on February 13, 2016 and after.

31. "Movant satisfied multiple felony indictment for extorting Spitzer," and this indictment was based on an investigation that relied on signatures forged by Spitzer in the above-mentioned felony indictment, which prosecutors knew.

32. They also stated that Movant forged signatures on the lease, however the leases were obtained not from the Movant's computer, but they were photos of an actual paper lease obtained elsewhere.

33. Movant never signed the leases forging Nippes' signature. Movant only pled guilty because she was in jail and she was depressed and suffering from an eating disorder. The evidence in the case was forged and based on false premises. For example, Movant and Spitzer both had Verizon contracts, but Movant's evidence was subpoenaed up to 2015 with all text messages included, and Spitzer's subpoena did not even show the phone numbers which he called during, or after, the Plaza Hotel incident. Movant's incoming calls from Spitzer were redacted and left blank, whereas other phone calls were still shown. This was done in order to falsely stress that it was Movant who called Spitzer instead of the other way around. Yet Spitzer called to Movant about 200 times within the prior four (4) months.

34. The ADA states that Movant mainly focuses on the charges related to Spitzer, however Movant counted that three (3) paragraphs contain Nippes' description and two (2) of them contain Spitzer's description. ADA tries to portray Movant as Spitzer-obsessed with the subtext being that his name should not be brought up at all. We see that the BXDA tries to cover for Spitzer again without investigating the case at all.

35. For the entire case, Movant had a translator. During her Miranda statements, she was not provided a translator and was, as is to be expected, very stressed out and tired. Movant's statements therefore cannot be counted, as they were given under duress. Movant simply was

not aware of what detectives had asked her about, as she thought they were talking about the apartment that she was forced to move from when Nippes threw her belongings on the street. This incident can simply be proven by a few subpoenas to the management and to Nippes' bank and Movant's bank. Movant did not know what the detectives meant at all. Detectives didn't even stated they are detectives and read Movant's Miranda rights only after interviewing her at the JFK airport, not at the Police Precinct. EXHIBIT39[65] EXHIBIT[66]

36. In addition, ADA states that the Movant had to move to dismiss charges as untimely within 45 days after indictment. The Movant, as well as her lawyers through Legal Aid, Mr. Wright and Mr. Murray, were not provided with any evidence at all. They could not discuss or duplicate the evidence as noted at T. Boyle application of protective order dated February 15, 2017. Movant simply did not know the status of the case, and therefore this statement is truly unfair as the corrupted case was covered by Spitzer's friends in the judicial system.

37. On December 6, 2016 Movant's attorney, Mr. Wright requested a Bill of Particulars, Grand Jury minutes, and for discovery in his affirmation. Mr. Boyle answered only on December 23, 2016, two days before the holidays, thus effectively denying the Movant's Attorney's request. Any discovery and even search warrants were denied to Movant's counsel.

38. Despite being stated that extortion started only in 2014 and some docs say it was 2010 where Spitzer claims 2013 or 2014 Movants indictment notices only after 2016,

39. In addition, when Movant went to report the forged signatures in September, 2022 when she discovered them, by Spitzer. A report number, after the report was taken by a young Police Officer wasn't provided to her and Movant was told they will not accept anything Spitzer-related from her. This is constitutes corruption and bias against Movant.

---

[65] This EXHIBIT provides exact time 2:41pm Movant was notified of her Miranda rights. After she was questioned by police in regards to crimes in both indictments.

[66] Current EXHIBIT provides the time 2:15pm as that Movant was interviewed by Detective from Bronx in regards to the case that Bronx was not even officially assigned to, thus could not be prosecuted on October 10, 2016. Also provides time that Movant was questioned – it was before her Miranda Rights were said to her.

40. In regards to Nippes: Movant only answered "yes" to everything because she didn't want to interfere and hold up her release from jail. She did not make statements, she agreed to the judge to whatever he was saying. It was very hard half an hour for her. She didn't understand what was going on because after one year in jail she did not have a clear mind, and was suffering from depression, frequent vomiting, isolation from having spent a year in solitary confinement, who wants to argue with the judge over anything?

41. A Warrant of arrest wasn't issued specifically, in case Spitzer needed Movant to do something else. For example, sign non disclosure agreement, as she did in mid July 2016. If arrest warrant was issued, she would be arrested and reported to the Police, unlike now, Bronx can successfully negotiate that they simply weren't notified of Movant's entry to the country by reporting her to at least 3 or 4 different agencies such as DHS, ICE, FBI and others.

WHEREFORE, I respectfully request, for the reasons set forth above

the judgment convicting me, Svetlana Travis, of Attempted Petite Larceny, a Class B

Misdemeanor be vacated.

Dated: New York, New York

3.23.2023

SVETLANA TRAVIS

_NY822 9095 33996_

_CC/11/23_

GALINA LUTSKER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LU6196898
Qualified in Kings County
My Commission Expires November 24, 20__

_03/23/23_

# CONTENTS

I.   MOTION 440.10 TO VACATE CRIMINAL JUDGMENT ............................ 3

II.  INTRODUCTION ......................................................................... 5

III. FACTS ..................................................................................... 6

   Case No. 1: Movant's Assault ................................................. 6

   Spitzer Threats and the Lawyer He Hires "for Movant" ........................ 11

   Case No. 2: Spitzer's Extortion ............................................... 14

   Boyle's False Claims about Movant and the Media ............................. 22

   Spitzer's Interference with Movant's Immigration Case ........................ 22

   Movant's Relationship with Spitzer ........................................... 25

   Confidentiality, Arrest and Detention ........................................ 28

   Case No. 3: Nippes' Larceny .................................................. 30

   The Trial Lawyer ............................................................. 37

   The Trial Evidence ........................................................... 41

   The Plea Bargain ............................................................. 42

IV.  THE POST TRIAL INVESTIGATION ........................................... 46

   Relevant Civil Lawsuits ...................................................... 46

   Case No. 4: The Tanarvska Robbery ........................................... 46

   Case No. 5: Immigration ......................................................

   VAWA, T, and U Cases ........................................................ 56

   Request for Forensic Document Examination .................................... 60

   Request for New DNA Testing .................................................. 62

Request for Discovery ................................................................................................ 64

V. SUMMATION ...........................................................................................................

Prosecutorial Misconduct ............................................................................................

Other Potentially Exculpatory Evidence ..................................................................