UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

SVETLANA TRAVIS,

**Plaintiff,**

v.

BANK OF AMERICA, N.A., et al.,

**Defendant.**

Case No. 1:22-cv-10102-JPO

------------------------------------------------------------- X

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**Facts of the Case**:

Plaintiff Svetlana Travis states as follows:

Plaintiff re-alleges her allegations against Defendant, and denies the Defendant's claims made in its Motion to Dismiss. Plaintiff identified the transactions in question in her complaint, and they were filed within the six year period allowed by the statute of limitations. At the time of the subpoena that the Bronx District Attorney filed with the bank in March 2016, former New York Governor Eliot Spitzer, with whom Plaintiff was in a sexual assault case, was accused of criminal behavior, and Plaintiff filed a police report. Defendant allowed Spitzer to proceed with criminal behavior in a criminal fraud scheme to cover up his illegal behavior. The forged checks were used as evidence to prosecute Plaintiff, an offense that carries a sentence of up to 15 years.

Plaintiff did not realize that Spitzer forged her checks until 2022, and the statute of limitations for breach of contract is not only 6 years, but two years from the date of realizing the fact of the breach. Defendant denied Plaintiff's request for bank statements, stating that they had been destroyed, but Plaintiff found out that they were still in Defendant's archive and that Defendant had been refusing to provide them to her.

Defendant was subpoenaed with a criminal subpoena in March of 2016, and this subpoena has remained confidential. Defendant was aware or reasonably should have been aware that Plaintiff was under criminal investigation and had to provide all account activity to the Bronx District Attorney's office. Defendant did not automatically review Plaintiff's account, but it was

reviewed by their employees and sent to the Bronx District Attorney with even more details about Plaintiff's account than was in the subpoena. The response contained all six years of Plaintiff's bank statements, but did not contain information regarding Plaintiff's mutual account with her ex-husband, which showed that she was a legitimately employed married woman, and her credit card account, which would show that Plaintiff paid her bills in a timely and consistent manner. Defendant only disclosed one account featuring "back page" ads for advertising photoshoots that were used by the Bronx District Attorney to accuse Plaintiff of advertising her services as a sex worker, however the ads weren't published for any offers of any sex work.

Defendant cut Plaintiff off as a client a few weeks before her arrest, so it is therefore reasonable to infer that Defendant was notified by Spitzer's team as to when their services were no longer needed. While Defendant accepted numerous checks by Spitzer and did whatever he needed done to have Plaintiff prosecuted, such as cutting Plaintiff off as a client, accepting forged checks, and transferring money to a foreign country online without talking to Plaintiff regarding where the money was going, which was standard procedure for banks to inquire of all wires going abroad over $10,000.

Since August 2022 Federal court allowed a breach of contract claim to go forward.

Defendant's contract language is vague.

Defendant's interpretation cannot be sustained.

There is a conflict between paragraphs in Defendant's presented contract.

Defendant alleges that anybody can deposit checks yet Defendant states that the account is for your use only.

Sample of Your Signature
To determine the authenticity of your signature, we may refer to
the signature card or to a check or other document upon which
your signature appears. We may use an automated process to
reproduce and retain your signature from a check upon which
your signature appears.

Here bank did not use automated system to compare signatures on the checks, instead a real person was monitoring account activity at Plaintiff's bank account.

If you create your own checks, or obtain them from someone
else, and we cannot accurately verify your signature on a check
by comparing it with a check that posted to your account, you
are responsible for any losses that may result from our inability
to use that check to verify your signature.

Account Changes

You must notify us of any change to your name or address. If
you do not provide notice of change of address, we may send
notices, statements and other correspondence to you at the
address maintained on our records for your account and you
agree to indemnify us and hold us harmless for doing so.
You agree to notify us in writing of any change in ownership or
authorized signers of your account or if an owner or authorized
signer on the account dies or is adjudicated incompetent.
If there is more than one owner and/or authorized signer on
the account, any one account holder or authorized signer may
request the account be closed without consent of any other
account holder or authorized signer. Further, any one account
holder may request, and we may, at our option, permit removal
of any account holder or authorized signer without consent of
any other account holder or authorized signer on the account.

Eliot Spitzer was not an authorized signer or secondary account holder. Defendant
provided Bronx DA with Spitzer's images and videos depositing the checks into Plaintiff's
bank account. Moreover, Defendant was aware that Spitzer previously engaged in wire
transfers into Plaintiff's bank account and that the wire transfer was done successfully,
from Spitzer's Chase bank in February 2016.

You acknowledge that we may, but need not, require a new sig-
nature card to be completed before any change in ownership or
authorized signers becomes effective and each time you open
a new account, we may require a Taxpayer Identification
Number certification(s). You also acknowledge that we may
require you to close your account in the event of any change in
ownership or change in the authorized signers.
After we receive notice of a change and all documents we
require regarding the change, we may take a reasonable period
of time to act on and implement the change to your account.

Endorsing Checks
We may endorse and/or collect items deposited to your
account without your endorsement but may, at our option,
require your personal endorsement prior to accepting an item
for deposit. If you deposit items which bear the endorsement

of more than one person or of persons who are not signers on
the account, we may refuse the item or may require you to have
their endorsement guaranteed before we accept an item.
We may accept for deposit checks payable to any signer on
your account when endorsed by any other signer.

Here Defendant was aware that there was no other signers on Plaintiff's bank account
and that Spitzer was not a signer, but they still allowed him to proceed with deposits of
his forged checks into Plaintiff's bank account.

When you endorse checks that you ask us to cash or deposit,
you must endorse checks in the area that extends 1 1/2 inches
from the trailing edge of the back of the check. You must also
confine information that you place or have preprinted on the
back of your checks to the same area. Otherwise, it may over-
lap into the area reserved for the banks' endorsements. The
trailing edge is the left side of the check when you look at it
from the front.

Third-Party Endorsements
We may require that checks and other items you want to
deposit or cash be endorsed by all parties to whom the items
are payable. We may require verification of any endorsement
through either an endorsement guarantee or personal identification.

Here Defendant was aware that the signature was not Plaintiff's. Defendant provided
several years of bank information to the Bronx DA and they noted that the same
signature was on all documents before the Subpoena was issued and before Spitzer
started to deposit checks into Plaintiff's bank account.

Examining Checks
We receive checks in great volume. This and compliance with
expedited funds availability laws require us to use automated
check processing procedures. Although we may visually review
a sample of checks and other items from time to time, reason-
able commercial standards do not require us to do so.

We select some checks for review based on certain criteria
that change from time to time. This means that most checks
are processed on the basis of the MICR (Magnetic Ink

Character Recognition) line printed along the bottom edge of the check, and are not individually examined for dates, maker signatures, legends or endorsements. You agree that we will have exercised ordinary care if we examine only those items that we have identified according to the criteria that we may establish in our discretion for inspection.

If we do visually review any check or other item, we may disregard any restrictive instructions or notations, such as an

instruction to permit withdrawals only upon more than one signature. We may return the item unpaid if, in our opinion, it does not bear a signature matching any specimen signature we have on file for your account. You agree, however, that we will not be liable to you for honoring any check or other item bearing a signature that, in our sole opinion, resembles the specimen signature on file with us.

Defendant was subpoenaed and required to report all activity of Plaintiff's bank account on weekly basis. Defendant monitored all activity manually and was aware that the signatures differ.

Since we do not individually examine most checks, it is critical for you to take care of your checks, promptly review your account statement, and immediately report any suspicious or unauthorized activity to us. You agree that automated processing of your checks is reasonable and that you accept responsibility for preventing and reporting forgeries, alterations, and other unauthorized uses of your checks or accounts. You agree that the exercise of ordinary care will not require us to detect forgeries or alterations that could not be detected by a person observing reasonable commercial standards.
Since some types of check fraud have become more difficult to detect, we may elect in some cases to make further inquiries about certain checks or other items that are presented for payment against your account. If we are unable to contact you, or take other steps, to determine with reasonable certainty that you authorized these payments, we may either pay the checks and other items or return them unpaid without any liability to

you.

Transferring Ownership
Your account is for your use only. It is non-transferable and
non-negotiable. Ownership of your account is transferable only
on our records with our consent.
• You may not grant, transfer or assign any of your rights
to your account without our written consent.
• Even if we consent, we may require that you close the
account and that the new account owner open a new
account in their name.
• We may refuse to acknowledge or accept your attempt-
ed pledge or assignment of your account or any interest
in it, including a notice of security interest.


Here Defendant states that the account is for Account holder use only, but they allowed to use Plaintiff's bank account by a third party, Eliot Spitzer to engage in fraud and deposit checks that do not have Plaintiff's signature, as well as login to online banking and send international wire transfers to Russia.

**Legal Argument:**

A plaintiff pursuing a breach of contract claim in New York must plead facts showing: (1) existence of an agreement; (2) performance by plaintiff; (3) breach of contract by defendant; and (4) resulting damage. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004). "Under New York law, absent a written agreement between the parties, 'a contract may be implied where inferences may be drawn from the facts and circumstances of the

case and the intention of the parties as indicated by their conduct.'" *Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.*, 401 B.R. 598, 615 (S.D.N.Y. 2009) (quoting *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998)).

When the parties' intent is unambiguous, the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. IBM*, 826 N.E.2d 806, 809 (2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Id.* at 69 (citing *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021(2007)). If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. *Id.* (Citation omitted) ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.").

Under New York law, "implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable person would understand to be included." *Rowe v Great Atl. Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978). The Second Circuit has held that "[u]nder New York law, if an employee is a part of a plan that gives a committee sole discretion to interpret the plan and determine whether the employee is entitled to benefits under the plan, a court can review such determinations to see whether they were made fraudulently, in bad faith, or arbitrarily." *Lucente v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 109, 114 (S.D.N.Y. 2003) (citing *Gehrhardt v. General Motors Corp.*, 581 F.2d 7 (2d Cir.1978); *Wyper v. Providence Washington Ins. Co.*, 533 F.2d 57 (2d Cir.1976); *Bradford v. New York Times*, 501 F.2d 51, 61 (2d Cir.1974)). More recently, in *Fishoff v. Coty Inc.*, the Second Circuit held that an incentive compensation plan that "contemplate[d] the exercise of discretion" by an employer also "include[d] a promise not to act arbitrarily or irrationally in exercising that discretion" under the implied covenant of good faith and fair dealing." *Fishoff v. Coty, Inc.*, 634 F. 3d 647, 653 (2d Cir. 2011).

Furthermore, New York law holds that the statute of limitations for fraud is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." **NY CPLR §213(8)**. Courts have found that "the inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred'" *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532, (N.Y. 2009), (quoting *Erbe v Lincoln Rochester Trust Co.*, 3 NY2d 321, 326 (N.Y. 1957)).

In this case, Plaintiff only discovered evidence of the breach in 2022, and could not have discovered it earlier through reasonable diligence, so her claim is not barred by the statute of limitations. In addition, Plaintiff can prove the four elements of a breach of contract. There was an agreement between the parties that the Plaintiff's account was for her use only, and there was a breach in that Defendant allowed Spitzer to deposit checks in her account with a forged signature and sent that activity to the Bronx District Attorney's office with the knowledge that Plaintiff was under criminal investigation. The Plaintiff suffered damages in the amount of

$50,000 because the Defendant allowed a check worth that amount in Plaintiff's account while she was incarcerated, when Defendant knew or reasonably should have known the checks were forged. Because of this, Plaintiff was indicted with felonies charges with $1 million bail.

Defendant's policies state "To determine the authenticity of your signature, we may refer to the signature card or to a check or other document upon which your signature appears. We may use an automated process to reproduce and retain your signature from a check upon which your signature appears", and "If you create your own checks, or obtain them from someone else, and we cannot accurately verify your signature on a check by comparing it with a check that posted to your account, you are responsible for any losses that may result from our inability to use that check to verify your signature." Defendant would thus have to return the money in question to Plaintiff. However, Defendant did not do so, in violation of its own policies. Defendant should have seen that Spitzer was depositing the checks and transferring the money to Russia, so Defendant is therefore complicit in Spitzer's crimes against Plaintiff.

To this day, Plaintiff has been unable to obtain unredacted records of her own bank account with Defendant, so that she cannot specify all transactions on the account. She therefore must subpoena the Defendant, Eliot Spitzer's bank, or the Bronx District Attorney's office if she cannot obtain the records from Defendant. Plaintiff has described everything properly in her original complaint. Finally, Defendant relies upon unsubstantiated reports from the press regarding her relationship with Spitzer, accusing her of extortion when the courts have dismissed such charges. Because Defendant was aware of the events in Plaintiff's case against former Governor Spitzer, it should have reasonably been aware of the fact that Spitzer allegedly perpetrated a terrible crime against Plaintiff, and Defendant thus allowed him to commit a financial crime against Plaintiff.

**Conclusion:**

For these reasons, Defendant is not entitled to a dismissal, and Plaintiff respectfully requests that the Defendant's Motion to Dismiss Plaintiff's complain be denied, along with any other relief that this Court may deem equitable and just.

Respectfully Submitted,         April, 11 2023

_____

Svetlana Travis

Plaintiff Pro Se